*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0181p.06

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

JOSEPH ARNOLD,

        *Defendant-Appellant.*

No. 04-5384

>

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-20089—Jon Phipps McCalla, District Judge.

Argued: September 13, 2006

Decided and Filed: May 18, 2007

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE,[*] CLAY, GILMAN, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert C. Brooks, Memphis, Tennessee, for Appellant. Joseph C. Wyderko, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee **ON BRIEF:** Robert C. Brooks, Memphis, Tennessee, for Appellant. Joseph C. Wyderko, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., David N. Pritchard, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

    SUTTON, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, DAUGHTREY, ROGERS, COOK, and McKEAGUE, JJ., joined, and in which GRIFFIN, J., joined except with respect to Sections IV.A.2., V., and VI. CLAY (p. 16) and GRIFFIN (pp. 17-22), JJ., delivered separate opinions concurring in part and dissenting in part. Judge CLAY joins Judge Griffin's opinion except with respect to Section II. of the opinion, and joins Section IV. of Judge Moore's dissenting opinion. MOORE, J. (pp. 23-35), delivered a separate dissenting opinion, in which MARTIN, COLE, and GILMAN, JJ., joined.

---

## OPINION

---

    SUTTON, Circuit Judge. Joseph Arnold challenges his felon-in-possession-of-a-firearm conviction, contending that the evidence does not support the verdict, that the district court violated

---

[*] The Honorable Julia S. Gibbons, Circuit Judge, took no part in the consideration or decision of the case.

1

his Confrontation Clause rights by admitting testimonial hearsay and that the district court made several erroneous evidentiary rulings during the course of the trial. We affirm.

## I.

At 7:43 a.m. on September 19, 2002, Tamica Gordon called 911 and told the emergency operator: "I need police. . . . Me and my mama's boyfriend got into it, he went in the house and got a pistol, and pulled it out on me. I guess he's fixing to shoot me, so I got in my car and [inaudible] left. I'm right around the corner from the house." Gordon identified her mother's boyfriend as Joseph Arnold, a convicted murderer whom the State had recently released from prison.

About five minutes after the dispatcher told three police officers about Gordon's call, the officers arrived at 1012 Oak View, the residential address that Gordon had provided to the 911 operator. Gordon exited her car and approached the officers, "crying," "hysterical," "visibly shaken and upset," and exclaimed that Arnold had pulled a gun on her and was trying to kill her. JA 112–14. She described the gun as a "black handgun." JA 127.

Soon after the officers arrived, Arnold returned to the scene in a car driven and owned by Gordon's mother. Gordon became visibly anxious again, exclaiming, "that's him, that's the guy that pulled the gun on me, Joseph Arnold, that's him." JA 115. She also told the officers that "he's got a gun on him." JA 116. Arnold exited the car, and the police patted him down to determine if he was carrying a weapon. When the pat-down did not produce a weapon, the officers asked Gordon's mother for permission to search the car. She consented, and the officers found a black handgun inside a clear, plastic bag directly under the passenger seat where Arnold had been sitting.

A grand jury charged Arnold with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). When Gordon did not appear to testify at Arnold's trial in response to a government subpoena, the district court ruled (1) that the government could admit a redacted recording of the 911 call (without the reference to Arnold as a convicted murderer) and Gordon's two statements at the scene under the "excited utterance" exception to the hearsay rule and (2) that the applicability of this well-established hearsay exception authorized the introduction of this evidence under the Confrontation Clause. The district court also declined to admit a statement from a private investigator hired by Arnold to the effect that Gordon had told the investigator, eight months after the incident, that she did not see Arnold with a gun. The jury found Arnold guilty of the single charge.

## II.

Arnold challenges the sufficiency of the evidence with regard to just one element of the crime: Did he possess a firearm? The jury heard several pieces of evidence that, when "view[ed] . . . in the light most favorable to the government," would allow it to conclude just that. *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Aarons*, 718 F.2d 188, 189 n.1 (6th Cir. 1983) ("Where the sufficiency of the evidence is properly before us, we consider that issue first because it is determinative of whether" the Double Jeopardy Clause prevents "the appellant [from] be[ing] retried.").

At trial, the jury learned that Tamica Gordon called 911 and told the emergency operator that Arnold had just threatened her with a gun. When officers arrived at the scene, they encountered a visibly shaken Gordon, who explained that she had just been in an argument with Arnold, her mother's boyfriend, and that he had threatened her with a gun. "Joseph Arnold," she told the officers, "pulled a gun on [me], he said he was going to kill [me]. He was arguing and [I] thought he was going to kill [me]." JA 114. Gordon "stated that she . . . saw him with a gun in his hand," JA 140, and "that she observed him cock the weapon," JA 143. Gordon described Arnold's weapon

as "a black handgun." JA 127, 140. "[B]ecause of the way she said that he cocked it," JA 127—that he "pulled back the slide," *id.*—and because of the way she described the gun, the officers concluded that the gun was a semiautomatic handgun, *id.*, and that "there would be a round chambered" in it, JA 133.

Soon after the officers arrived, Gordon's mother pulled up in a car with Arnold sitting in the passenger seat. "[A]s the car pulled up, [Gordon] got back excited, she started crying [and] pointing at the car saying that's him, that's the guy that pulled the gun on me, Joseph Arnold, that's him[,] . . . he's got a gun on him." JA 115–16. When the officers approached Arnold and "asked him what was going on, . . . he basically said that they were arguing." JA 117. After obtaining permission to search the car, the officers found a plastic bag containing a loaded, black, semiautomatic handgun with a round in its chamber directly under the passenger seat of the car.

In the light cast by this evidence, "*any* rational trier of fact," *Jackson*, 443 U.S. at 319, could conclude beyond a reasonable doubt that Arnold possessed the gun the officers found below his seat. The jury heard evidence that Gordon, her mother and Arnold were at home that morning, that Arnold and Gordon began arguing and that during the argument Arnold retrieved a gun and pointed it at Gordon as she fled to call 911. They learned that Gordon described the gun to officers as a black handgun. They heard that the way Arnold cocked the weapon indicated to the officers that it was a loaded semiautomatic and that it had a round of ammunition in its chamber. And the jury learned that when, moments later, a car containing Arnold arrived at the scene, the police found a gun inches from the passenger seat where Arnold was sitting. The gun in every way matched Gordon's description: it was black; it was semiautomatic; it was loaded; and it had a round in its chamber. And it was found within easy reach of Arnold.

Because "possession may be proved by direct or circumstantial evidence," *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), we cannot overturn the jury's decision merely because it had to draw reasonable inferences to find Arnold guilty. It is true, for example, that the government did not offer evidence that, after Arnold threatened Gordon with a gun, someone saw him take the gun, wipe his fingerprints off it, place the gun in a plastic bag and stick it under his seat in Gordon's mother's car. But the jury *was* told enough to know that, after Gordon left the house to call 911, Arnold had the opportunity to take these steps, and "*any* rational trier of fact" reasonably could infer that he did. *See United States v. Moore*, 208 F.3d 411, 413 (2d Cir. 2000) (upholding felon-in-possession conviction even though "no witnesses saw or heard [the defendant] throw a handgun into the bedroom closet [where officers found it], and there were no identifiable fingerprints found on the gun that was recovered" because "such evidence was not necessary for a reasonable jury to conclude that [the defendant] had been in possession of the gun that was recovered by the police" when officers testified that they had seen the defendant earlier possessing a gun of the same size and color); *see also United States v. Crowe*, 291 F.3d 884, 886–87 (6th Cir. 2002) (upholding conviction for carrying a firearm during a drug trafficking crime even though testifying officer "could see only a small portion of the object" he identified as a firearm and he "could not state for sure whether the object . . . was a real handgun or only a toy" because evidence need not "remove every reasonable hypothesis except that of guilt") (internal quotation marks omitted); *United States v. Austin*, 133 F. App'x 271, 275 (6th Cir. May 26, 2005) (upholding felon-in-possession conviction where arresting officer observed defendant "with a weapon from eight to ten feet away, through a plate-glass window, before [he] fled down a hallway" and officers later found a gun "in a trash can in the hallway down which [the defendant] ran").

As in all criminal trials, the jury did not have to draw these inferences. But it reasonably could have reached these conclusions—and when that is the case we must respect the jury's inferences over our own.

Even if the jury had not drawn these inferences, moreover, Arnold had little to gain from the uncontradicted evidence that remained before the jury. The only other conclusion the jury reasonably could have drawn was that Arnold possessed, cocked and pointed a loaded, black, semiautomatic handgun at Gordon, disposed of it somewhere, got into a car, left and, minutes later, returned to the scene with *another* black, semiautomatic, loaded weapon with a chambered round stowed beneath his passenger seat. That is not a traditional defense to a felon-in-possession charge, and it was not the defense that Arnold presented to the jury. Arnold argued that he had never threatened Gordon with a gun, period. JA 226–27 (closing argument). He did not argue that, even if he had threatened Gordon with a gun that morning, he managed successfully to hide *that* gun, and the gun the officers found directly under his passenger seat later that morning was a different weapon.

Regardless of which arguments Arnold did make and regardless of which arguments he did not make, the critical point is that the jury could have drawn different inferences from this evidence, and our mandate is to affirm when the jury's choice was a rational one—which it was here. *See United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (affirming felon-in-possession conviction over sufficiency challenge; one officer testified that he saw defendant "holding a long black object that looked like a shotgun" and "that he saw [the defendant] throw the object to the ground as [the defendant] began to flee from the residence"; another officer "testified that upon investigating the residence after [the defendant] was apprehended, she found a black and chrome rifle in the front yard"); *United States v. Thomas*, 497 F.2d 1149, 1150 (6th Cir. 1974); *see also United States v. Daniels*, 170 F. App'x 409, 410, 412–13 (6th Cir. Mar. 7, 2006) (affirming felon-in-possession conviction over sufficiency challenge; one officer testified that he saw defendant throw to the ground a "silver metallic" object, "possibly a handgun or something to that effect"; that officer unsuccessfully attempted to locate the object after the defendant was detained; another officer later searched the area and found a ".25 caliber pistol" matching the first officer's description).

No doubt the linkage between the evidence would have been even stronger had Gordon described some other unique characteristic of the gun or, better yet, described the gun as "a Hi Point, 9 millimeter." But Arnold has pointed to no other feature of the gun that Gordon should have recalled, and to his credit Arnold does not argue that the sufficiency-of-the-evidence requirement of the Due Process Clause compels a witness to "make out the name brand of [a] weapon, the model, the model number, []or the gun's serial number" as an assailant threatens her with it. *See Moore*, 208 F.3d at 413 (upholding felon-in-possession conviction even though the witnesses who saw the defendant possess a "large black and silver handgun" did not describe the brand, model, or serial number and noting that the jury could reasonably conclude that the gun the witnesses described and the gun the police recovered "were one and the same"). Numerous cases hold that evidence not unlike the evidence presented here—eyewitness testimony describing a firearm actually possessed by the defendant that matches a firearm later recovered by the police—sufficiently connects the gun described to the gun found. And indeed most of these cases involve connections far more attenuated than the one here. *See, e.g.*, *Barnett*, 398 F.3d at 522; *Crowe*, 291 F.3d at 887; *United States v. Black*, 525 F.2d 668, 669 (6th Cir. 1975); *see also United States v. Smith*, 79 F. App'x 97, 99 (6th Cir. Oct. 21, 2003); *Whitis v. United States*, No. 94-6333, 1995 U.S. App. LEXIS 22308, at *3, *6, *11 (6th Cir. Aug. 3, 1995); *United States v. Smith,* No. 90-2293, 1991 U.S. App. LEXIS 22429, at *7 (6th Cir. Sept. 18, 1991).

All of this suffices to resolve this aspect of the case. The defendant was charged with possessing a handgun, and the government proved that he actually possessed the handgun identified in the indictment—based on evidence that the victim saw him threaten her with a handgun minutes before the police discovered a handgun under Arnold's car seat, one that met the description the victim gave of the gun. The government did not argue at trial that he *constructively* possessed the gun, and it is quite understandable why: It had no reason to do so.

Yet even if we treat this prosecution as arising under a constructive-possession theory, as the dissent does, that does not help Arnold. "Presence *alone*" near a gun, true enough, does not "show the requisite knowledge, power, or intention to exercise control over" the gun to prove constructive possession. *United States v. Birmley*, 529 F.2d 103, 107–08 (6th Cir. 1976) (emphasis added). But that is not what we have here. Here we have "other incriminating evidence, coupled with presence, . . . [that] serve[s] to tip the scale in favor of sufficiency." *Id.* at 108. And that "other incriminating evidence" was incriminating indeed: Minutes before the defendant was found with a handgun under the car seat in which he was riding, he was seen actually possessing a gun matching the description of the one found under his seat—and of course not just possessing it but *using* it to threaten someone.

Nor do the cases cited by the dissent alter this conclusion. In some of the cited cases, the sole connection between the defendant and the gun was the gun's proximity to the defendant. *See Birmley*, 529 F.2d at 107; *see also United States v. Whitfield*, 629 F.2d 136, 143 (D.C. Cir. 1980). But as we have shown, this is not a case in which the "record [was] devoid of any . . . evidence" other than the defendant's mere presence in a car with a weapon. *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994).

In some of the cited cases, the only evidence connecting the defendant to the gun (other than proximity) was that the defendant at some distant point in time and in some other place had possessed *a* gun—in one instance the defendant possessed a gun "more than two years before the charged . . . offense," *United States v. Hishaw*, 235 F.3d 565, 573 (10th Cir. 2000), and in another instance the defendant had committed "two offenses involving guns" at some unidentified point in the past, *United States v. Kelso*, 942 F.2d 680, 682 (9th Cir. 1991). Here, however, the defendant threatened the victim with a gun minutes before the police found a gun under his car seat, and that same gun matched the description of the gun the defendant used to threaten the victim.

And in some of the cited cases, the proffered evidence connecting the defendant to the gun (aside from proximity) was deemed to be too attenuated. *See United States v. Beverly*, 750 F.2d 34, 37 (6th Cir. 1984) (evidence showed only that the defendant "was standing close to a waste basket which contained two guns, and that [he] had at some point touched one of the guns"; but the evidence did not show when the guns were placed in the waste basket); *United States v. Blue*, 957 F.2d 106, 107–08 (4th Cir. 1992) (holding that facts "barely" fell short of "support[ing] a finding of constructive possession" when officer found gun under passenger defendant's seat after observing defendant's "shoulder . . . dip as if [he] were reaching under the seat"). But in both of those cases, the courts emphasized that no eyewitness testimony connected the gun to the defendant—an evidentiary gap that the record in this case closes through the statements of the victim. *See Beverly*, 750 F.2d at 36 (explaining that government's evidence did not include testimony from anyone who saw defendant "with a gun in his hand"); *Blue*, 957 F.2d at 108 ("The government introduced no . . . testimony that [defendant] had been seen with the gun."). In the final analysis, whether one chooses to look at this verdict as resting on actual possession or constructive possession, the fact remains that it legitimately rests on ample evidence of possession—evidence that requires us to uphold the verdict.

### III.

Arnold also challenges the admissibility of three out-of-court statements—the 911 call, Gordon's initial statements to police officers upon their arrival at the crime scene and Gordon's statement to officers upon Arnold's return to the scene—under the excited-utterance exception to the hearsay rule. Under Rule 803(2) of the Federal Rules of Evidence, a court may admit out-of-court statements for the truth of the matter asserted when they "relat[e] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." To satisfy the exception, a party must show three things. "First, there must be an event

startling enough to cause nervous excitement. Second, the statement must be made before there is time to contrive or misrepresent. And, third, the statement must be made while the person is under the stress of the excitement caused by the event." *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983). All three inquiries bear on "the ultimate question": "[W]hether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *Id.* at 1058 (internal quotation marks omitted). We apply abuse-of-discretion review to a district court's application of the rule. *See United States v. Beverly*, 369 F.3d 516, 540 (6th Cir. 2004).

**The 911 Call.** Gordon's statements to the 911 operator readily satisfy the first and third prongs of the test. As to the first requirement, being threatened by a convicted murderer wielding a semi-automatic handgun amounts to a startling event that would prompt at least nervous excitement in the average individual, if not outright trauma. As to the third requirement, Gordon plainly remained in this state of anxiety during the 911 call. Throughout the call, the operator had to tell her to "calm down" and "quit yelling" and often had difficulty understanding her frantic pleas for help.

The record also supports the district court's finding that the call took place soon after Arnold threatened Gordon—"slightly more than immediately" after the threat, in the district court's words—which satisfies the second factor. The district court listened to the tape of the 911 call five times, noted that Gordon said "*he's* fixing to shoot me," not that he "*was* fixing to shoot me," JA 52 (emphasis added), and ultimately concluded that there was an immediacy to her statements. Arnold does not challenge the district court's factual conclusions regarding the meaning of the tape.

Case law supports the view that Gordon made the statement "before there [was] time to contrive or misrepresent." *Haggins*, 715 F.2d at 1057. *Haggins*, for example, upheld the admission of statements by a four-year-old child made more than an hour after the incident but while the child was still suffering the trauma from it. Other cases have upheld the admission of statements that also were made after the startling event but well within the traumatic range of it. *See, e.g.*, *United States v. Baggett*, 251 F.3d 1087, 1090 & n.1 (6th Cir. 2001) (applying the excited-utterance exception to statements made several hours after the last of several spousal beatings over a three-day period); *see also United States v. McCullough*, 150 F. App'x 507, 510 (6th Cir. Oct. 18, 2005) (applying exception to statements made "not . . . longer than two-and-a-half hours" after witnessing companion's arrest); *United States v. Green*, 125 F. App'x 659, 662 (6th Cir. Mar. 15, 2005) (applying exception to statements made three hours after the startling event); *see also United States v. Alexander*, 331 F.3d 116, 123 (D.C. Cir. 2003) (applying exception to statements made 15 to 20 minutes after the startling event); *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (applying exception to statements made four hours after the startling event); *United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998) (applying exception to statements made within three hours of the startling event).

Contrary to Arnold's suggestion, our cases do not demand a precise showing of the lapse of time between the startling event and the out-of-court statement. The exception may be based solely on "[t]estimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset," *Haggins*, 715 F.2d at 1058 (internal quotation marks omitted); *see United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003), a conclusion that eliminates an unyielding requirement of a time line showing precisely when the threatening event occurred or precisely how much time there was for contrivance. The district court made this exact finding, a finding supported by evidence that, in the words of *Haggins*, "will often suffice." 715 F.2d at 1058 (internal quotation marks omitted).

The dissent, though not Arnold, raises the concern that the uncorroborated content of an excited utterance should not be permitted by itself to establish the startling nature of an event. But

this issue need not detain us because considerable non-hearsay evidence corroborated the anxiety-inducing nature of this event: (1) Gordon's act of calling 911; (2) the fear and excitement exhibited by the tenor and tone of Gordon's voice during the 911 call; (3) Gordon's distraught demeanor personally observed by Officers Brandon and Newberry upon their arrival at the scene; (4) Gordon's renewed excitement upon seeing Arnold return; and (5) the gun matching Gordon's description found underneath the passenger seat in which Arnold was sitting. This dispute, in short, is not one of the "very few cases" in which this "knotty theoretical problem" has raised its head. *See* 2 McCormick on Evidence § 272 (6th ed. 2006) ("Fortunately, only a very few cases need actually confront th[e] knotty theoretical problem [of whether independent corroborating evidence of startling events is necessary] if the courts view what constitutes independent evidence broadly, as they should where the circumstances and content of the statement indicate trustworthiness.") (internal footnote omitted).

          **Gordon's statement to officers upon their arrival at the scene.** When the officers arrived at the scene soon after learning of the 911 call, Gordon exited her car and approached the officers, "crying," "hysterical," "visibly shaken and upset," and exclaimed that Arnold had threatened her with a gun. JA 112–14. For many of the same reasons the district court had authority to admit the 911 call, it had authority to admit this statement. It remained the case that a startling event had occurred. The time that had passed between the end of the 911 call and the officers' arrival on the scene—5 to 21 minutes, based on the officers' testimony that the dispatch contacted them "about 8:00" or "a little bit before 8:00," JA 71, 112, 139, (meaning the dispatch could have occurred any time between the end of the 911 call at 7:45 and 8:00) and that they arrived five to six minutes later—did not give Gordon sufficient time to misrepresent what had happened. *See Alexander*, 331 F.3d at 123 ("Considering the nature of the startling occurrence—Alexander allegedly had a gun and threatened both to 'do something' to [declarant] and to 'mess [up]' her apartment—the passage of 15 to 20 minutes hardly suggests that the district court abused its discretion in admitting the 911 call."). And as shown by Gordon's frantic statements to the officers upon their arrival, she remained visibly agitated by Arnold's threat. The court did not abuse its discretion in admitting the statement.

          **Gordon's statement to officers when Arnold pulled up next to the police car.** Soon after the officers' arrival, which is to say from 30 seconds to 5 minutes after they reached the scene, a car with Arnold in it pulled up next to the police car, at which point Gordon made the last of her statements admitted as an excited utterance. "[T]hat's him," she said, "that's the guy who pulled a gun on me, Joseph Arnold, that's him." JA 115. The district court permissibly admitted this statement as part of the same emotional trauma that captured Gordon's earlier statement to the officers. On top of that, the unexpected appearance of the victim's assailant independently suffices to establish a startling event followed by an understandably excited verbal response. *See Beverly*, 369 F.3d at 540; *cf. United States v. Scott*, 69 F. App'x 317, 321 (6th Cir. July 10, 2003); *United States v. Taylor*, No. 92-5120, 1992 U.S. App. LEXIS 29048, at *3 (6th Cir. Nov. 5, 1992). The district court did not abuse its discretion in admitting the statement.

          The dissent's view of the excited-utterance question prompts a few responses. *First*, the dissent, though not Arnold, contends that the district court failed to place the burden of proof on the government. Yet the district court, in making this ruling, concluded that "the elements to allow the exception have been demonstrated by the government." JA 79. And we, too, have placed the burden on the government. *See supra* at 5 (noting that, to qualify a statement as an excited utterance, "a party must show three things").

          *Second*, the dissent claims that, instead of saying "he's fixing to shoot me," Gordon said "he finna shoot me," Dissent at 29–30, thereby eliminating the "'s" between he and finna (which the dissent finds to be a slang term for "fixing to"). But Arnold has not challenged the district court's factual determination that Gordon told the 911 operator "he's fixing to shoot me," and accordingly this issue is not properly before us. Nor, at any rate, is it clearly the case, or even somewhat clearly

the case, that the dissent properly interprets the tape—given the rapidity and anxiety with which Gordon spoke during the 911 call. This difficulty reinforces not only our decision to defer to the district court's interpretation of the tape but also our decision that indeed it was an excited utterance. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

IV.

A.

At trial, Arnold also challenged the admissibility of these three statements under the Confrontation Clause of the Sixth Amendment. Quite understandably then, quite wrongly now, the district court rejected these challenges on the ground that the applicability of a traditional hearsay exception to each statement (in this instance, the excited-utterance exception) freed the evidence from challenge under the Confrontation Clause in accordance with *Ohio v. Roberts*, 448 U.S. 56 (1980). In light of the Supreme Court's intervening decision in *Crawford v. Washington*, 541 U.S. 36 (2004), that is no longer an accurate mode of analysis. *See id.* at 61. Under *Crawford*, when the prosecution seeks to introduce "testimonial" statements against a criminal defendant, when in the words of the Sixth Amendment the "accused" is being subjected to "witnesses against him," U.S. Const. amend. VI, the defendant generally has a right to confront those witnesses—without regard to what the modern-day Federal (or State) Rules of Evidence have to say about the matter. The Confrontation Clause, *Crawford* thus establishes, bars the "admission of *testimonial statements* of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53–54 (emphasis added).

In announcing this rule, *Crawford* chose not to provide a "comprehensive" definition of "testimonial" hearsay, *id.* at 68, but it did offer initial guidance on the meaning of the term. The Court explained that "testimony" involves "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51 (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). And it explained that testimonial hearsay at a minimum includes "a formal statement to government officers" by "[a]n accuser" in the form of an affidavit, a deposition, prior testimony or the like. *Id.* at 51–52. While these initial explanations sufficed to resolve *Crawford*, which involved statements made during a station-house interrogation, the Court reviewed two consolidated cases last Term that required it to give further definition to the line between testimonial and nontestimonial hearsay. *See Davis v. Washington*, 126 S. Ct. 2266 (2006).

"Statements are nontestimonial," *Davis* explained, "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273–74. *Davis* applied this definition to two recurring types of witness statements: statements to 911 operators and statements to the police at the scene of the crime.

"A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call," the Court held, "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 2276. In reaching this conclusion, the Court noted four distinctions between the 911 call before it and the interrogation at issue in *Crawford*. The accuser, Michelle McCottry, "was speaking about events *as they were actually happening*," not describing events "hours" after they occurred. *Id.* "[A]ny reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency," prompting her to make "a call for help against bona fide physical threat." *Id.* "[T]he

nature of what was asked and answered in *Davis*" demonstrated that "the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Id.* And there was a "striking" "difference in the level of formality" of the two statements, with Crawford "responding calmly" at the police station to the officer's questions and the officer taking notes about the answers while "McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe." *Id.* at 2276–77.

"[T]he circumstances of McCottry's interrogation," the Court concluded, "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 2277. She thus "was not acting as a *witness*; she was not *testifying*." *Id.* The Court acknowledged that an interrogation that begins as a plea for help may turn into testimony once the emergency purposes of the 911 call have been satisfied. *Id.*

The Court reached a different conclusion in the second case, which also stemmed from a domestic dispute and which concerned Amy Hammon's statements to investigating police officers at her home after the police responded to a "reported domestic disturbance." *Id.* at 2272 (internal quotation marks omitted). The characterization of these statements was "much easier" to resolve, the Court held, because they "were not much different" from the statements in *Crawford*. *Id.* at 2278. The interrogation arose from "an investigation into possibly criminal past conduct"; "[t]here was no emergency in progress"; Hammon told the officers when they arrived that "things were fine"; when an officer eventually questioned Hammon a second time and elicited the challenged statements, "he was not seeking to determine . . . 'what is happening,' but rather 'what happened'"; the police separated Hammon from her husband during the interview and prohibited him from intervening; and the interview "took place some time after the events described were over." *Id.* Under these circumstances, the Court held, Hammon's answers to the officers' questions amounted to testimonial statements.

In reaching this conclusion, the Court rejected the theory "that virtually any 'initial inquiries' at the crime scene" will be nontestimonial. *Id.* at 2279. At the same time, it cautioned, it was not "hold[ing] the opposite—that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that officers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* (internal quotation marks and brackets omitted). "Such exigencies," the Court added, "may *often* mean that 'initial inquiries' produce nontestimonial statements. But in cases like this one, where [Hammon's] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.*

As *Davis*'s assessment of the 911 call and the on-the-scene statements indicates, the line between testimonial and nontestimonial statements will not always be clear. Even if bona fide 911 calls frequently will contain at least some nontestimonial statements (assuming the emergency is real and the threat ongoing) and even if a victim's statements to police at the scene of the crime frequently will contain testimonial statements (assuming the emergency has dissipated), that will not always be the case, and difficult boundary disputes will continue to emerge. Each victim statement thus must be assessed on its own terms and in its own context to determine on which side of the line it falls.

1.

**The 911 Call.** Gordon's statements to the 911 emergency operator offer a close analogy to McCottry's statements in *Davis*. As in *Davis*, we assume for the sake of argument that the inquiries of the 911 operator amount to "acts of the police." 126 S. Ct. at 2274 n.2. And as in *Davis*, we do not doubt that Gordon sought protection from an ongoing emergency. When Gordon fled from her

gun-wielding assailant, the defendant remained at large and remained (in the present tense) "fixing to shoot" her. *See id.* at 2276 ("McCottry was speaking about events *as they were actually happening*, rather than describing past events.") (internal quotation marks and brackets omitted). The tape of the 911 call itself makes clear that Gordon had made "a call for help against [a] bona fide physical threat." *Id.* The 911 operator's handling of the call shows that she was trying to "elicit[] statements . . . necessary to be able to resolve the present emergency," *id.* (emphasis omitted), by attempting to compose Gordon and by seeking to understand the gravity of the peril she faced. Gordon's frantic responses "were provided over the phone, in an environment that was not tranquil, or even . . . safe" because she had just left the house and had no reason to know whether Arnold was following her or not. *Id.* at 2277. The fear that the district court noted in Gordon's voice communicated that she was scarcely concerned with testifying to anything but simply was seeking protection from a man with a gun who had killed before and who had threatened to kill again. The primary purpose and effect of the 911 operator's questioning was to resolve the crisis, with the questions and answers coming in spite of, not because of, the possibility of a later criminal trial.

Nor had the "exigency of the moment . . . ended," *id*. at 2277, before Gordon made the 911 call. While Gordon left the house and entered her car around the corner before making the 911 call rather than trying to make the call in Arnold's presence, that did not make the emergency less real or less pressing. It is one thing for the *assailant* to start "runnin[g]" after his victim calls 911, to leave in a car and to give the victim an opportunity to lock the door, all of which happened in *Davis* and all of which suggested that the responses to the 911 operator may have evolved into testimonial hearsay. *Id.* at 2271, 2277. It is another thing for the *victim* to flee the house and for the assailant still to be "fixing to shoot" her. In *Davis*, the assailant left the scene in a car because he knew the police were on their way, and there thus was no reason to think that he would be back—factors that markedly diminished the peril the victim faced. Gordon by contrast left the residence, went around the corner and called the police. At the time she made the call, she had no reason to know whether Arnold had stayed in the residence or was following her. What she did know is that he had a gun; he had just threatened her; he was still in the vicinity; there was still "somebody runnin' around with a gun" nearby, *United States v. Thomas*, 453 F.3d 838, 844 (7th Cir. 2006) (internal quotation marks omitted); there was in short an "emergency in progress," *Davis*, 126 S. Ct. at 2278.

Nor need we consider whether the 911 call evolved into testimonial hearsay over the course of its nearly two-minute duration. Arnold makes no such argument; he contends only that the entire call should have been suppressed because the exigency had dissipated before the call began.

2.

**Gordon's statement to officers upon their arrival at the crime scene.** While it may often be the case that on-the-scene statements in response to officers' questions will be testimonial because the presence of the officers will alleviate the emergency, this is not one of those cases. Neither the brief interval of time after the 911 call nor the arrival of the officers ended the emergency. Arnold remained at large; he did not know that Gordon had called 911; and for all Gordon (or the officers) knew Arnold remained armed and in the residence immediately in front of them or at least in the nearby vicinity.

The exchange between Gordon and the officers also suggests that the officers primarily were focused on meeting the emergency at hand, not on preparing a case for trial. As soon as the police arrived and before they had a chance to ask her a question, Gordon exited her car, "walked towards [them], . . . crying and . . . screaming, [and] said Joseph Arnold pulled a gun on her, [and] said he was going to kill her." JA 114. The officers tried to "tell[] her to gather herself and [to] slow down." JA 115.

While the fact that Gordon's initial statement was unprompted and thus not in response to police interrogation does not by itself answer the inquiry, *Davis*, 126 S. Ct. at 2274 n.1, this reality at least suggests that the statement was nontestimonial. So, too, does the distress that the officers described in her voice, the present tense of the emergency, the officers' efforts to calm her and the targeted questioning of the officers as to the nature of the threat, all of which suggested that the engagement had not reached the stage of a retrospective inquiry into an emergency gone by. No reasonable officer could arrive at a scene while the victim was still "screaming" and "crying" about a recent threat to her life by an individual who had a gun and who was likely still in the vicinity without perceiving that an emergency still existed. And nothing that Gordon told them, and certainly nothing about the way she told it to them, would have allayed concerns of a continuing threat to Gordon and the public safety, to say nothing of officer safety.

During the few moments the officers spoke to Gordon, moreover, the primary purpose, measured objectively, of the question they asked her—for "a description of the gun," JA 133—was to avert the crisis at hand, not to develop a backward-looking record of the crime. Contrary to the contention of the partial dissent**,** this question did not transform the encounter into a testimonial interrogation. Asking the victim to describe the gun represented one way of exploring the authenticity of her claim, one way in other words of determining whether the emergency was real. And having learned who the suspect was and having learned that he was armed, they surely were permitted to determine what kind of weapon he was carrying and whether it was loaded—information that has more to do with preempting the commission of future crimes than with worrying about the prosecution of completed ones. What officers would not want this information—either to measure the threat to the public or to measure the threat to themselves? *Cf. Davis*, 126 S. Ct. at 2276 (911 operator's questions regarding assailant's identity objectively aimed at addressing emergency because "the dispatched officers might" then "know whether they would be encountering a violent felon"). And what officer under these circumstances would have yielded to the prosecutor's concern of building a case for trial rather than to law enforcement's first and most pressing impulse of protecting the individual from danger?

Nor does the fact that Gordon made her statement to investigating police officers on the scene by itself establish that it was testimonial. *Davis* disclaimed creating any such rule. 126 S. Ct. at 2279. Officers investigating domestic disputes, it observed, "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim. . . . Such exigencies may often mean that initial inquiries produce nontestimonial statements." *Id.* (internal quotation marks, brackets and emphasis omitted). Gordon's statements also stand in marked contrast to Amy Hammon's on-the-spot testimonial statements in *Davis*. Here, by all accounts, the officers sought only to bring initial calm to the situation (by reassuring the victim) and to understand the threat to the public and their own safety (by learning that Arnold had a loaded semiautomatic handgun). To the extent they made inquiries at all, they never strayed from asking questions clarifying the extent of the emergency and obtaining information necessary to resolve it. Hammon in comparison told the arriving officers that "things were fine . . . and there was no immediate threat to her person"; she spoke with officers while "actively separated from the defendant" who had been detained and was with other officers in a different room; she "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and then she summarized all of this in an affidavit for the officers. *Id.* at 2278. The ongoing-emergency questioning in the former offers a poor analogy to the structured, distress-free questioning in the latter.

3.

**Gordon's statement to officers when Arnold suddenly returned to the scene.** Gordon's statement to the officers when Arnold returned to the scene bears even less resemblance to testimony than her initial statement to the officers. Her exclamation—"that's him, that's the guy that pulled

the gun on me"—was prompted not by *ex parte* questioning by the officers but by Arnold's sudden reappearance. When she not only described Arnold as her assailant but also added that "he's got a gun on him," JA 116, no one can doubt that Gordon *and* the officers faced a risky situation or that Gordon sought to obtain their protection. This was not a statement prepared for court. "No 'witness,'" after all, "goes into court to proclaim an emergency and seek help." *Davis*, 126 S. Ct. at 2277. The statement thus "was not 'a weaker substitute for live testimony' at trial," *id.* (quoting *United States v. Inadi*, 475 U.S. 387, 394 (1986)), but had independent evidentiary value separate and apart from any "courtroom analogue[]," *id.* It was nontestimonial.

As with the district court's evidentiary ruling, the dissent questions whether the district court allocated the burden of proof to the government on the Confrontation Clause issue. Arnold again has not raised the issue, and accordingly he has waived it. The point does not, in any event, have traction. As the above analysis reveals, the government has met its burden of proving that Gordon's statements to the 911 operator and at the scene were nontestimonial.

Noting that Gordon used "past tense" verbs at several points during the 911 call, the dissent contends that there was no longer an ongoing emergency when Gordon made the 911 call and when the officers arrived on the scene. But the entire 911 conversation begins with, and takes place in the context of, a present-tense plea for help: "I need police." Gordon's "past tense" statements described discrete facts contributing to what, from an objective perspective, constituted an ongoing emergency requiring police protection. It does not improve matters to characterize Gordon's statement as "he finna shoot me." Even if "finna . . . connote[s] future action," as the dissent suggests, Dissent at 31 n.9, it was the future action of Arnold shooting her that Gordon desperately sought to avoid. Doubtless, "heavy breathing," "footsteps pounding the pavement," and the like, Dissent at 33, would make our work easier. But these are not irreducible minimums of an ongoing emergency. Her 911 call, her frantic behavior during and after the call and the nature of the threat (a gun-wielding assailant who had just been released from jail after a murder conviction, who was "fixing to shoot" her and who was still in the area) all sufficed to show that Gordon had every reason to fear for her safety.

Nor, once the officers arrived, is it the case that Gordon did nothing "consistent with an ongoing emergency." Dissent at 34. That she rushed up to the officers and was so upset that she initially "couldn't speak," JA 73, surely bespeaks the conduct of one who feels threatened—and who could blame her under the circumstances? And by remaining near the house, she hardly showed otherwise. She called 911 after she got out of the house, and the 911 operator told her that the officers "would be over there as soon as they can" and to "be watching for them." Staying near the house thus offered the quickest route to making contact with the officers. And staying near her car at the same time gave her an immediate-departure option if Arnold found her before the officers did.

B.

That leaves a follow-up question: While the Confrontation Clause plainly restricts the admission of testimonial statements, does it continue to place any restrictions on the admission of nontestimonial statements? *Crawford* left the question open, 541 U.S. at 61, and in the absence of direction from the Court we have continued to apply the *Roberts* test to these types of statements since *Crawford*, *see, e.g.*, *United States v. Johnson*, 440 F.3d 832, 843–44 (6th Cir. 2006); *United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005); *United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005).

*Davis* answers the question. The Confrontation Clause, *Davis* explains, is "solely concerned with testimonial hearsay," 126 S. Ct. at 2274 (internal quotation marks omitted), meaning that the only admissibility question in this setting is whether the statement satisfies the Federal (or State) Rules of Evidence. *See id.* (noting that the Confrontation Clause's "focus on testimonial

hearsay" "must fairly be said to mark out not merely its 'core,' but its perimeter") (internal quotation marks and brackets omitted); *see also Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007) ("[T]he Confrontation Clause has no application" to "out-of-court nontestimonial statement[s]."). Because we have concluded that these three statements were nontestimonial and because Arnold has not shown that the admission of the statements violated the Federal Rules of Evidence, the district court properly permitted the jury to consider them.

V.

Arnold lastly argues that the district court committed reversible error by refusing to admit the statement of a private investigator hired by Arnold in which Gordon told the investigator, eight months after the incident, that in counsel's words "she never saw [Arnold] with a gun that day." JA 67. We disagree.

At the beginning of the trial, Arnold's lawyer told the district court that he wished to put the private investigator on the stand to introduce statements, including an affidavit signed by Gordon, to the jury. In response, the district court told Arnold's counsel that the proposed evidence was "just hearsay." *Id*. In reply, Arnold's counsel did not argue generally that an exception to the hearsay rule applied; he did not argue specifically that Rule 806 of the Federal Rules of Evidence permitted the introduction of the evidence, not for the truth of the matter asserted, but for impeachment purposes; and at one point, in response to one of the court's statements that it was "just hearsay," Arnold's lawyer merely said, "I'm just laying it out there for your consideration on the front end, so we don't go down this path and take valuable time" later on. *Id*.

On this record, Arnold's lawyer did not preserve the objection that Rule 806 permits the introduction of the evidence for impeachment purposes. When a trial court refuses to admit evidence on hearsay grounds, counsel must explain whether a hearsay exception applies—here, for example, by pointing to Rule 806 or by stating that the evidence is offered for impeachment purposes—in order to preserve the issue for appeal. Otherwise, the district court has no opportunity to consider the meaning of the exception and no opportunity to address its applicability. Plain-error review thus applies. Fed. R. Evid. 103(a)(2), 103(d); *see, e.g.*, *United States v. Seymour*, 468 F.3d 378, 387 (6th Cir. 2006) (applying plain-error review to exclusion of evidence because alleged ground for admission was not raised below); *United States v. Humphrey*, 279 F.3d 372, 377–78 (6th Cir. 2002) (applying plain-error review to excluded hearsay evidence that allegedly "could have been admitted as a business record" because "defense counsel did not raise this specific exception at trial"); *United States v. Phillips*, 888 F.2d 38, 41 (6th Cir. 1989) (applying plain-error review to excluded evidence because the ground for admissibility (bias) was not raised below); *United States v. Millen*, 594 F.2d 1085, 1088 (6th Cir. 1979) ("In the face of the government's complete failure to present to the District Court a reasoned argument for the admissibility of this evidence . . . we decline to speculate about grounds for admissibility . . . ."); *cf. Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 748–49 (6th Cir. 2005) (holding that offer of evidence failed to satisfy Rule 103(a)(2) because when the trial court excluded the evidence on hearsay grounds, the attorney did not "argue that the evidence should be admitted under Rule 801(d)(2)(D) of the Federal Rules of Evidence as statements made by the employees against the interests of Pilkington and within the scope of their employment, which is the plaintiffs' new position on appeal").

To show plain error, a defendant must establish the following: "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotation marks and brackets omitted). If these three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Arnold satisfies the first and second prongs of the plain-error test.  As the government acknowledges, Rule 806 permits the introduction of this statement for impeachment purposes (though not for its truth), and the error is plain.  *See* U.S. Supp. Br. at 51–52; Fed. R. Evid. 806.

We need not decide whether the evidence satisfies the third prong of the plain-error test because it does not satisfy the fourth prong.  At issue are two pieces of evidence:  an affidavit signed by Gordon and witnessed by Arnold's private investigator and an oral statement made by Gordon to Arnold's private investigator.  While both pieces of evidence apparently are to the effect that Gordon "never saw Arnold with a gun that day" (we say "apparently" because the affidavit was never entered into evidence, though the government concedes that it says as much), their exclusion did not "seriously affect[] the fairness, integrity, or public reputation" of the proceedings in this case.  *Cotton*, 535 U.S. at 631.  After the trial, Gordon faced a contempt action for failing to appear in court in response to a government subpoena on the first day of Arnold's trial.  The record from the contempt hearing, which is included as part of the record in this case, shows that Arnold's private investigator spoke to Gordon and obtained the affidavit eight months after Arnold's arrest.  At the contempt hearing, which occurred two-and-a-half months after the trial, Gordon testified under oath that she was "positive," JA 261, and "absolutely sure," JA 245, that she saw Arnold with a gun.  Acknowledging that she said something else when she met with Arnold's private investigator, she explained that the statements to Arnold's investigator were the product of "pressure," namely pressure from her mom "telling me it wasn't" a gun that her boyfriend (Arnold) was holding.  JA 273.  That Gordon thrice told the police that Arnold possessed a gun, that she made these statements when she had no time to contrive, that the police found a gun under the seat of the car in which Arnold was sitting, that she made a different statement eight months later only after pressure from her mother and that she eventually retracted even that statement under oath at the contempt hearing, all show that the exclusion of the testimony of Arnold's private investigator was not the kind of "particularly egregious" mistake that would justify a finding of plain error.  *United States v. Young*, 470 U.S. 1, 15 (1985) (internal quotation marks omitted).

Brief responses to the partial dissent and the dissent on this point are in order.  The partial dissent concludes that we need not reach the issue because the defense never formally proffered the investigator as a witness.  That may be true.  But the government did not make this argument on appeal, and it seems odd to hold the defendant responsible for one procedural mistake (not making a formal proffer) when the government has made an equally serious procedural mistake (not challenging the absence of a formal proffer).

The dissent questions whether our cases require more of counsel in proposing evidence than Evidence Rule 103(a)(2) requires.  The point may be an interesting one but is best left for resolution in another case.  As this appeal comes to the court, the parties have argued the case in the context of satisfying the requirements of our cases, not in the context of overruling those cases.  As we read those prior decisions, moreover, they do not require the proponent of evidence to base a proffer upon a specific rule of evidence; they require the proponent only to inform the trial court why the proposed evidence should be admitted—so, for example, had Arnold's counsel explained that the investigator's testimony should be admitted to impeach Gordon, that would have sufficed.  Nor have we been able to find any cases—from any circuit court—concluding that the only requirement for preserving error in this setting is to identify the *content* of the proposed evidence.  At the same time, numerous cases from other circuits embrace our modest requirement that the proponent explain why the evidence "should be admitted."  *United States v. Scott*, 48 F.3d 1389, 1397 (5th Cir. 1995) ("Excluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted.") (internal quotation marks omitted); *see also, e.g.*, *United States v. Moore*, 425 F.3d 1061, 1068 (7th Cir. 2005) ("Although this circuit does not require litigants to make formal offers of proof when evidence is excluded, the record must show the equivalent: grounds for admissibility, the proponent must inform the court and opposing counsel what he expects to prove by the excluded evidence, and he must

demonstrate the significance of the excluded testimony.") (internal quotation marks omitted); *Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d 1404, 1407 (10th Cir. 1991) ("[M]erely telling the court the content of proposed testimony is not an offer of proof. Rather, . . . the proponent must explain what it expects to show and the grounds for which the party believes the evidence to be admissible so that the trial court is on notice of the purpose for which the evidence is offered while there is still time to remedy the situation.") (internal quotation marks, brackets and ellipses omitted).

It also remains unclear whether Evidence Rule 103 operates by itself in this situation. In *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988), the Court reasoned that Rule 103(a)(2) and Civil Rule 46 work together to require offers of proof to make apparent not only the content of the evidence but also the grounds for its admission. *Id.* at 174; *see also Kasper v. Saint Mary of Nazareth Hosp.*, 135 F.3d 1170, 1175–76 (7th Cir. 1998) (The proponent "must, however, not only make clear to the judge what the evidence is that he wants to present, Fed. R. Evid. 103(a)(2), but also his ground . . . for believing that the evidence should be admitted. Fed. R. Civ. P. 46."). Criminal Rule 51 mirrors Civil Rule 46, *see* Fed. R. Crim. P. 51 advisory committee's note 1 ("This rule is practically identical with" Civil Rule 46 and it addresses "a matter of trial practice which should be the same in civil and criminal cases in the interest of avoiding confusion."), and courts have embraced similar reasoning in the criminal context, *see United States v. Muniz*, 684 F.2d 634, 640 (9th Cir. 1982) ("Federal Rule of Criminal Procedure 51 requires a party to state the specific grounds upon which the evidence is admissible."); *United States v. Fredericks*, 599 F.2d 262, 264 (8th Cir. 1979) ("Federal Rule of Criminal Procedure 51 requires a party to make known to the trial court the specific grounds upon which the admissibility of evidence is urged."); *see also* 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence 2d § 5040, at 882 (2005) ("[I]n considering the elements of an offer of proof, we shall consider not only the language of Rule 103(a)(2) but the implications of Civil Rule 46 and Criminal Rule 51.").

The one case cited by the dissent, *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006), does not alter this conclusion. There, in contrast to this case, no one indicated "that the proposed testimony was not admissible under the Federal Rules of Evidence," *id.* at 925, as the trial judge did here. And there, in contrast to this case, "the government adequately made the *grounds for admissibility* known to the court simply by arguing that it should not be excluded for failure to comply with" the one ground for exclusion identified at trial—Federal Rule of Criminal Procedure 16(a)(1)(G). *Id.* (emphasis added).

Lastly, while the dissent's observation about the interplay between Federal Rules of Evidence 103(a)(1) and 103(a)(2) may deserve consideration at some point, now is not the time and this is not the case. The issue has not been joined by the parties, and no appellate court to our knowledge has embraced the argument.

VI.

For these reasons, we affirm.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. I join Judge Griffin's opinion concurring in part and dissenting in part in its entirety except with respect to section II of the opinion, which holds that the potential impeachment evidence with respect to the private investigator was properly excluded. With respect to the district court's refusal to admit the private investigator's statement that Tamica Gordon told him she had never seen Joseph Arnold with a gun on the day in question, I join section IV of Judge Moore's dissenting opinion. I would therefore reverse and remand for a new trial as would Judges Griffin and Moore.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.  I join in Sections I, II, and III of the majority opinion and in the result of Section V and that portion of Section IV that rejects defendant's constitutional challenge to the admissibility of complainant Tamica Gordon's 911 telephone call, her initial 30-second narrative on-the-scene statement, and her later spontaneous statement, "that's him, that's the guy that pulled the gun on me, Joseph Arnold, that's him." However, I respectfully dissent from the majority's constitutional analysis and disposition pertaining to the complainant's hearsay statements made in response to police interrogation.  Because these errors were not harmless, I would reverse and remand for a new trial.

I.

The majority holds that all of Tamica Gordon's hearsay statements made to the police at the alleged crime scene were "nontestimonial" and, therefore, not subject to defendant's right of confrontation as guaranteed by the Sixth Amendment.  I disagree.

The Confrontation Clause of the Sixth Amendment provides:  "In all criminal prosecutions, the accused shall . . . be confronted with the witnesses against him . . . ."  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Confrontation Clause guarantee, "testimonial" statements made by a declarant who does not testify at trial are admissible against an accused only if the declarant is unavailable and the accused was afforded a prior opportunity for cross examination.  Although the *Crawford* Court did not formulate a definition for "testimonial" statements, it emphasized that under any advocated definition "[s]tatements taken by police officers in the course of interrogations" are testimonial statements.  *Id.* at 52.

Recently, in *Davis v. Washington*, 547 U.S. — , 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), and its consolidated case, *Hammon v. Indiana*, the Supreme Court provided further guidance with regard to the parameters of statements deemed "testimonial."  First, in *Davis*, the Court held that the complainant's 911 telephone call was nontestimonial and, therefore, not subject to the Confrontation Clause of the Sixth Amendment.  In upholding the admissibility of the 911 call, the Court stated:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[1]

---

[1] Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations – which in some circumstances tend to generate testimonial responses.  This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial.  The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.  (Part of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly *not* the result of sustained questioning.  *Raleigh's Case*, 2 How. St. Tr. 1, 27 (1603).)  And of course

even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.

*Id.* at 2273-74. In *Davis*, because the 911 call was made in response to an ongoing emergency, and in connection with the need for police assistance, the portions of the 911 call at issue were deemed nontestimonial.

The dichotomy adopted by the Supreme Court in *Davis* led to the opposite result in the companion *Hammon* case. In *Hammon*, the police responded to a late-night report of a domestic disturbance at the home of Hershel and Amy Hammon. Upon arriving at the scene, the police encountered a "somewhat frightened" Amy, alone on the front porch, who initially told the investigating officers that "nothing was the matter." 126 S. Ct. at 2272. Amy gave the police permission to enter the house, where an officer noticed a gas heating unit in the living room with pieces of broken glass on the ground in front of it and flame emitting from the front of the heating unit. *Id.* Hershel, who was in the kitchen, told the police that he and his wife had been in an argument, but that "everything was fine now" and the argument "never became physical." *Id.* At this point, Amy had come back inside and, while Hershel was kept in a separate area of the house, an officer interviewed Amy and then had her fill out and sign a battery affidavit. In the affidavit, Amy alleged that her husband broke the furnace, shoved her to the floor into the broken glass, hit her in the chest, and threw her down.

The State charged Hershel with domestic battery and with violating his probation. Amy was subpoenaed, but she did not appear at her husband's subsequent bench trial. The trial court admitted the affidavit and testimony of the officer who questioned her over defense counsel's objection that the opportunity for cross examination of the declarant was improperly precluded. The trial judge thereafter found Hershel guilty on both charges, and the Indiana Supreme Court ultimately affirmed, concluding in pertinent part that, although Amy's affidavit was testimonial and wrongly admitted, its admission was harmless beyond a reasonable doubt.

After granting certiorari, the United States Supreme Court reversed the defendant's convictions and remanded for further proceedings, holding that Amy Hammon's statements were accusations of past events, not "cries for help" emanating from an ongoing emergency, and, thus, were testimonial in nature. Consequently, the Court held, under these particular circumstances, that the Sixth Amendment operated to exclude Amy's affidavit:

> Both Indiana and the United States as *amicus curiae* argue that this case should be resolved much like *Davis*. For the reasons we find the comparison to *Crawford* compelling, we find the comparison to *Davis* unpersuasive. The statements in *Davis* were taken when McCottry [the complainant] was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described. And after Amy answered the officer's questions, he had her execute an affidavit, in order, he testified, "[t]o establish events that have occurred previously." App. in No. 05-5705, at 18.
>
> Although we necessarily reject the Indiana Supreme Court's implication that virtually any "initial inquiries" at the crime scene will not be testimonial . . . we do not hold the opposite – that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that "[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."

*Hiibel*, 542 U.S., at 186, 124 S. Ct. 2451. Such exigencies may *often* mean that "initial inquiries" produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial. Cf. *Crawford, supra*, at 52, n.3, 124 S. Ct. 1354.[6]

---

[6] Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory "nontestimonial" evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial *use* of, not the investigatory *collection* of, *ex parte* testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are.

*Id.* at 2279.

In the wake of *Crawford,* our courts must undertake a two-step inquiry before admitting or excluding hearsay evidence that is subject to a Confrontation Clause challenge. First, it must be determined whether the hearsay evidence is admissible under the applicable rules of evidence. Second, if the evidence is admissible under the rules, it must be determined whether the hearsay statement is testimonial or nontestimonial. The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross examination." *Crawford,* 541 U.S. at 53-54.

The majority recognizes these principles and correctly applies them to complainant's 911 call and to her initial 30-second narrative. With regard to Gordon's initial 30-second statement, Officer Brandon testified that as soon as she arrived at the scene, ". . . this young woman walked towards me, and she was crying and she was screaming, she said Joseph Arnold pulled a gun on her, she said he was going to kill her. He was arguing and she thought he was going to kill her. He pulled a gun on her." This initial exchange lasted "[m]aybe 30 seconds at the most," during which time Officer Brandon "was telling her to gather herself and slow down." I agree with the majority that this initial statement, like the 911 call, was nontestimonial for the reasons that it was not the product of police interrogation, but rather a "cry for help" made while the declarant perceived an emergency and the need for immediate police assistance.

In addition, the majority properly affirms the admission of Gordon's spontaneous statement "that's him, that's the guy that pulled the gun on me, Joseph Arnold, that's him," on the ground that her exclamation was prompted not by the *ex parte* questioning of the officers, but rather by defendant's sudden reappearance and, thus, was nontestimonial.

However, I respectfully disagree with the majority's analysis and resolution of complainant's on-the-scene statements made in response to police interrogation. What may have started as an emergency police response to a 911 call evolved into a standard police interrogation of a past crime. Between five and fifteen minutes after the 911 call was received, three police officers arrived at the given address and observed a young woman (Gordon), who was near a car parked outside the house, crying and visibly shaken. Although Officer Brandon estimated that the initial conversation between Gordon and the officers lasted approximately 30 seconds, Officer Newberry testified that the investigating officers had a conversation with Gordon lasting "a few minutes," "maybe five minutes"

before defendant arrived on the scene. As previously noted, Gordon told the officers that Arnold had pulled a gun on her during an argument and had threatened to kill her. During her conversation with the officers, Gordon began to calm down, and the officers attempted to elicit a description of the gun from the complainant. As Officer Brandon testified,

> [W]hen we got there . . . we was [sic] trying to get a description of the gun, and she said it was a black gun, a black handgun, which is a very vague description, and we was [sic] trying to decide whether it was a revolver or semiautomatic revolver which would be the gun like you think a cowboy would have where you can spin it out, but a revolver – I mean a semiautomatic gun, most of them are chambered where you pull the hammer back. This is called a hammer, you pull it back, and she made the motion that he did that, which means there would be a round chambered, let us know that it was a semiautomatic black handgun. So that kind of narrowed it down.

In response to these questions posed by the officers regarding the weapon allegedly possessed by Arnold, Gordon described the gun as a black handgun. She further described to the officers how defendant stood in the doorway with the gun in his hand and cocked the gun. Based on Gordon's hand gestures showing how the gun was cocked, the officers concluded the gun was a black semi-automatic handgun that would have a round chambered in it.

In my view, the complainant's description of the gun was testimonial in nature and material in proving the felon in possession of a firearm charge against defendant. Once Gordon was safely in the protective custody of the three police officers, the perceived emergency had ceased. Accordingly, after that point, her responses to questions asked by the police regarding past events were testimonial and therefore subject to defendant's right to confrontation as guaranteed by the Sixth Amendment.

The "safety of the officers" argument posed by the majority is not persuasive. The police knew defendant might be armed. Obtaining a description of the weapon was standard crime investigation.

The present case appears to be the scenario envisioned by the Supreme Court in *Davis*, in which testimonial statements "evolve" from an initial response to an emergency:

> This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, "evolve into testimonial statements," 829 N.E.2d, at 457, once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S., at 53, n.4, 124 S. Ct. 1354. This presents no great problem. Just as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," *New York v. Quarles*, 467 U.S. 649, 658-659, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984), trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence. Davis's jury did not hear the *complete* 911 call, although it may well have heard

some testimonial portions. We were asked to classify only McCottry's early statements identifying Davis as her assailant, and we agree with the Washington Supreme Court that they were not testimonial. That court also concluded that, even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt. Davis does not challenge that holding, and we therefore assume it to be correct.

*Davis,* 126 S. Ct. at 2277-78.

Here, Gordon's past-tense statements describing the weapon, made in the protective presence of three police officers and, conversely, out of defendant's presence, and given in direct response to the officers' *ex parte* questioning, were akin to McCottry's later statements described above in *Davis*, and Amy Hammon's "narrative of past events . . . at some remove in time from the danger she described." *Davis*, 126 S. Ct. at 2279. Gordon's statements in this regard were therefore testimonial and inadmissible pursuant to the Confrontation Clause of the Sixth Amendment.

Having concluded that a confrontation error occurred, the next inquiry is whether the constitutional error is harmless beyond a reasonable doubt. *United States v. Robinson*, 389 F.3d 582, 593 (6th Cir. 2004) (citing *Delaware v. Arsdall*, 475 U.S. 673, 684 (1986) and *United States v. Askarov*, 299 F.3d 896, 898 (6th Cir. 2002)). "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Arsdall*, 475 U.S. at 684.

Here, at least with respect to the description of the gun, the error is not harmless beyond a reasonable doubt. Although there was circumstantial evidence connecting defendant to a gun, the prosecution's case was strengthened considerably by the match of the complainant's description of the firearm to the black, semi-automatic, loaded handgun found under the seat in the vehicle in which defendant had been sitting. Although complainant Gordon previously told the 911 operator that defendant had threatened her with a gun and exclaimed to the police upon their arrival that defendant "pulled a gun on her," there was no description of the weapon until police questioning. In the words of Officer Brandon ". . . we was [sic] trying to get a description of the gun . . . ." Through such questioning, the officers learned from the complainant that the gun was a loaded, black, semi-automatic handgun. In the absence of any corroborative eyewitness testimony or evidence that defendant actually possessed a firearm, the admission into evidence of complainant's responses to police interrogation asking for a description of the gun was therefore highly prejudicial and violative of defendant's Sixth Amendment right to confrontation.

Moreover, at oral argument, the government conceded that, if a confrontation error occurred with regard to Gordon's hearsay statements, the error could not be deemed harmless. I accept the government's concession in this regard and would reverse and remand for a new trial on this basis.

II.

In Section V, the majority rejects defendant's challenge relating to impeachment evidence that could have been offered through the testimony of private investigator Sam Lewis. The majority holds that error requiring reversal did not occur because defendant failed to sustain his burden of proving plain error, FED. R. EVID. 103(d). I agree with the result, but disagree with the majority's rationale.

The record reveals that, after the jury was selected, the government made two motions in limine. The first sought the admission of portions of the 911 taped telephone call. The second

requested admission of the on-the-scene hearsay statements made by Tamica Gordon to the police. During oral argument on the government's motions to admit its evidence, defense counsel advised the court that he had a witness (private investigator Sam Lewis) who was prepared to testify that with regard to Gordon's repeated claims that defendant had a gun, when talking to investigator Lewis ". . . she gave a different story." The court responded "That's just hearsay. There's no exception." Defense counsel later argued that such evidence may be admissible because ". . . this is along the lines of rebuttal type information . . . ." Although a discussion occurred between defense counsel and the trial judge, defense counsel did not move for the admission of the potential impeachment evidence. Accordingly, the trial court did not make a ruling admitting or excluding this evidence.

Later, after the government rested its case, the Honorable Jon Phipps McCalla asked defense counsel ". . . I thought we had an investigator who was going to testify . . . ." Defense counsel Terrell Harris responded: "No sir, we crossed the investigator yesterday. I knew better to bring him over here after that discussion yesterday."

There was no error regarding the potential impeachment evidence for the reason that there was no motion for a ruling and, thus, no ruling made. Because there was no ruling to appeal, the majority inappropriately strays into a plain error analysis.

### III.

For these reasons, I concur in part and dissent in part. I would reverse and remand for a new trial.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  I disagree with the majority opinion's conclusions regarding the sufficiency of the evidence, the admissibility of Gordon's statements under the excited-utterance exception to the hearsay rule as well as under the Confrontation Clause, and the district court's refusal to admit testimony from a defense witness. Accordingly, I respectfully dissent for the reasons detailed below.

## I.  SUFFICIENCY OF THE EVIDENCE

The court must first determine whether the prosecution presented sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that Joseph Arnold possessed the handgun found in his girlfriend's car.  The only evidence of such possession consists of (1) Arnold's presence in the car, and (2) Tamica Gordon's statements to the police that Arnold had threatened her with *a* gun (although not necessarily *the* gun at issue) earlier that day.  As demonstrated by the cases the majority opinion itself cites, such evidence is not sufficient to support a felon-in-possession conviction under either an actual or constructive possession theory.

First, the majority opinion tellingly sloughs over a significant piece of evidence that undercuts its conclusion—the gun retrieved from Gordon's mother's car bore no fingerprints.  If, as the majority opinion concludes, Arnold had threatened Gordon with a gun and then took the gun with him into Gordon's mother's car, it stands to reason that the gun would carry his fingerprints. The gun found in the car, however, had none.  This inconvenient fact undercuts the entirety of the majority's analysis.

Second, the majority opinion provides no basis for concluding that a reasonable jury could have found that Arnold *actually* possessed the gun found in his girlfriend's car.  "Actual possession exists when a tangible object is in the immediate possession or control of the party." *United States v. Beverly,* 750 F.2d 34, 37 (6th Cir. 1984) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir. 1973)).  Put another way, "[a] person who knowingly has direct physical control over a thing at a given time is then in actual possession of it." *United States v. Frederick,* 406 F.3d 754, 765 (6th Cir. 2005) (quoting *United States v. Wolfenbarger,* 426 F.2d 992, 994 (6th Cir. 1970)).

The jury lacked sufficient evidence to convict on an actual-possession theory because the government supplied no evidence that Arnold had "direct physical control over a thing"—the gun—at the relevant "given time"—when he was in the car.  Instead, the government offered evidence only of Arnold's mere proximity to the gun.  Proximity, however, is insufficient to support a conviction for actual possession. *Cf. Beverly*, 750 F.2d at 37 (holding that evidence that defendant was standing next to a waste basket containing gun was insufficient to prove even constructive possession, let alone actual possession).

On this basis, each of the cases the majority opinion cites is distinguishable.  For instance, *United States v. Moore*, 208 F.3d 411 (2d Cir. 2000), involved a situation in which "the officers saw defendant-appellant Curtis Moore standing in the middle of the courtyard with a black and silver handgun in his waistband." *Id.* at 412.  Similarly, in *United States v. Crowe*, 291 F.3d 884 (6th Cir. 2002), the officer "observed the butt end of a black semi-automatic handgun protruding from under the waistband of Crowe's pants." *Id.* at 885.  *See also United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (officer saw defendant "holding a long black object that looked like a shotgun" which police later recovered in the area where the defendant had dropped it); *United States v. Daniels*, 170 F. App'x 409, 410 (6th Cir. 2006) (unpublished opinion) (officer saw defendant pull

out an object looking like a handgun and throw it to the ground, and handgun was later recovered); *United States v. Austin*, 133 F. App'x 271, 275 (6th Cir. 2005) (unpublished opinion) (officer saw defendant holding a gun before he fled, and later recovered the gun along his path of flight). In each of these cases, the government had evidence that the defendant had "direct physical control" over the gun in question at the relevant time because in each case, the police officer witnessed the defendant with the gun on his person. *See Frederick*, 404 F.3d at 765. No such evidence exists here.

As noted in the panel's per curiam opinion, Gordon's accusation that Arnold had a gun when he threatened her does not address whether Arnold had direct physical control over the relevant gun (the one found in the car) at the relevant time (when officers arrested him). Gordon's testimony is insufficient to sustain a conviction because conviction requires proof that Arnold "possess[ed] the firearm and ammunition *specified in the indictment.*" *United States v. Schreane,* 331 F.3d 548, 560 (6th Cir. 2003) (emphasis added). Because the prosecution presented no evidence showing that Arnold had physical control over the recovered firearm when it was recovered or immediately before, no rational trier of fact could have found that the government proved actual possession beyond a reasonable doubt.

Likewise, the government has not provided sufficient evidence for a reasonable jury to conclude that Arnold *constructively* possessed the gun found in the car. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Craven,* 478 F.2d at 1333. One way the government may prove the defendant had the power to exercise dominion over a firearm is through evidence that he had dominion or control over the *premises* where the firearm was located. *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir. 1998), *cert. denied,* 525 U.S. 1166 (1999). However, a defendant's presence where a firearm was found, without more, is insufficient to establish "the requisite knowledge, power, or intention to exercise control" over the firearm. *United States v. Birmley,* 529 F.2d 103, 107-08 (6th Cir. 1976).

Our previous decisions rejecting sufficiency challenges by defendants found in cars containing guns are all readily distinguishable, as in each case, there was sufficient evidence tying the defendant to a particular gun found in the car. For instance, in *United States v. Murphy*, 107 F.3d 1199 (6th Cir. 1997), we noted that a defendant found in a car with a gun could not mount a successful sufficiency challenge when he was the car's only occupant, and thus clearly exercised dominion over the car. *Id*. at 1208. But Arnold was not alone in the car. In *United States v. Carter*, 355 F.3d 920 (6th Cir. 2004), a defendant's sufficiency challenge was unsuccessful because other occupants in the car were precluded from being the source of the firearm. *Id*. at 925. But here, the government presented no evidence showing that Arnold's girlfriend, the car's driver, could not have been the source. In other cases, we rejected sufficiency challenges when the defendant was the owner of the car *and* had arranged to sell the gun, *Birmley*, 529 F.3d at 107, when the defendant drove the car containing the gun, *id*., when police saw the defendant attempting to conceal the weapon, *Carter*, 355 F.3d at 925; *Schreane*, 331 F.3d at 561, and when the defendant and the owner of the gun had a close relationship, *id*. But here, Arnold neither drove nor owned the car, there is no evidence that the police saw him attempt to conceal it (let alone touch it at all), and the government never established the identity of the gun's owner. Because the record contains no evidence of any of these factors, this court lacks any basis upon which to conclude that Arnold exercised dominion or control over the car or the gun found inside it.

This conclusion is reinforced by our decision in *United States v. Beverly,* 750 F.2d 34 (6th Cir. 1984), which involved a gun found in a home.[1] An officer executing a search warrant found Beverly and another person (Austin) in the kitchen of yet another person's (Hatfield's) residence. *Beverly,* 750 F.2d at 35. While patting down Beverly and Austin, the officer noticed two handguns in a waste basket between the two individuals. *Id.* Beverly's fingerprint was on one of the guns, and the print's location suggested that the gun "would have had to have been laid down." *Id.* at 36. We held that these facts were insufficient to prove constructive possession; instead, the evidence "establishe[d] only that Beverly was in the kitchen of Hatfield's residence, that Beverly was standing close to a waste basket which contained two guns, and that Beverly had at some point touched one of the guns." *Id.* at 37. In the instant case, Arnold and Gordon's mother were located close to where the gun was discovered, just as the defendant and his companion were in *Beverly.* Here, however, no fingerprint was found on the firearm, so the evidence of constructive possession does not rise even to the level that we rejected as insufficient in *Beverly.* The majority's half-hearted attempt to distinguish *Beverly* falls flat. The majority emphasizes that no eyewitness had seen Beverly possess the gun, but fails to explain how such testimony (present in this case) is more indicative of constructive possession than a defendant's *fingerprint* on a gun that had been laid down soon before it was recovered. Again, if the evidence in *Beverly* could not sustain a conviction, the evidence in this case is woefully inadequate.

Similarly, our sister circuits have reversed on sufficiency grounds convictions stemming from far stronger facts than those of this case. For instance, in *United States v. Blue*, 957 F.2d 106 (4th Cir. 1992), the Fourth Circuit overturned a conviction for felon-in-possession when the police found the gun underneath the defendant's seat, notwithstanding the officer's testimony that he saw the defendant "dip as if [he] were reaching under the seat with his right hand" after the officer pulled the car over. *Id.* at 107. Similarly, in *United States v. Hishaw*, 235 F.3d 565 (10th Cir. 2000), *cert. denied*, 533 U.S. 908 (2001), the Tenth Circuit overturned such a conviction notwithstanding that the defendant was the driver of the car, and notwithstanding testimony that he had possessed a similar weapon on earlier occasions. *Id.* at 572-73. *See also United States v. Kelso,* 942 F.2d 680, 681-82 (9th Cir. 1991) (notwithstanding defendant's access to gun, rejecting argument that the defendant passenger constructively possessed a gun found behind the driver's seat because government failed to show defendant's ownership or awareness of the gun); *United States v. Whitfield,* 629 F.2d 136, 142-43 (D.C. Cir. 1980) (concluding that no reasonable juror could find evidence that gun was found under defendant passenger's seat within his reach was sufficient to support constructive possession).

Nor do Gordon's statements and gestures, as recounted by the police officers, establish a sufficient nexus between Arnold and the gun to support Arnold's conviction. At best, they suggest that Arnold possessed a black, semiautomatic firearm at some unspecified earlier time. Again, conviction requires proof that Arnold "possess[ed] the firearm and ammunition *specified in the indictment.*" *Schreane,* 331 F.3d at 560 (emphasis added). Lacking any such evidence, the majority opinion takes the tenuous leap of inferring from Arnold's putative earlier possession that he constructively possessed the black, semiautomatic gun recovered from the vehicle. While it is true that the recovered firearm matched Gordon's generic description—statements that the brandished gun was black and gestures that an officer interpreted to indicate a semiautomatic with a chambered round—these attributes are too common for this equivalence to prove that Arnold constructively possessed the gun found in the car. *See Hishaw,* 235 F.3d at 571, 572 (holding that testimony that the defendant was seen with a semiautomatic pistol on several prior occasions was "simply too remote and too vague to support the inference that [the defendant] constructively possessed the

---

[1]Constructive-possession decisions involving homes can inform the inquiry in cases involving vehicles. *See United States v. Cazares,* 121 F.3d 1241, 1245 (9th Cir.1997) ("The same reasoning [used in vehicle cases] applies to occupants of a house.")

pistol" found in the car).[2]  The government has not established any nexus between the gun found in the car and Arnold.  Accordingly, this case is distinguishable from *United States v. Thomas*, 497 F.2d 1149 (6th Cir. 1974), because in *Thomas*, the nexus between the defendant and the gun was the defendant's own statement referring to the gun in question as "my gun."  *Id*. at 1150.  By contrast, the only connection between Arnold and the gun specified in the indictment is that officers found it under a seat where Arnold was sitting in a car he was not driving and did not own.

And even if we were to infer that Arnold had previously possessed the gun found under the seat, prior possession cannot establish possession at a later time.  *Beverly*, 750 F.2d at 37 (evidence that defendant had earlier held and laid down a gun was insufficient to establish constructive possession).

Until today, mere coincidence has never been a substitute for constitutionally sufficient evidence of possession.  But with its opinion, the majority sweeps aside decades of authority from this court and others, rendering this Circuit alone in the country in holding that possession of a gun may be shown without some direct nexus between the gun and the defendant.

## II.  EXCITED UTTERANCE

After rewriting this circuit's law on the threshold of evidence required to support a conviction for being a felon in possession of a firearm, the majority opinion next errs by concluding that Gordon's statements to the 911 operator and to the police are admissible as excited utterances.  Because the record does not support the conclusion that any of Gordon's statements fall into this exception to the hearsay rule, I dissent on this ground as well.

As the majority correctly notes, Federal Rule of Evidence 803(2) permits a court to admit out-of-court statements for the truth of the matter asserted when they "relat[e] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  The majority opinion also correctly cites the three elements of the *Haggins* test:  (1) a startling event, (2) the statement's being made so temporally close to that event that the declarant lacked time to contrive or misrepresent, and (3) the statement's being made under the stress of excitement caused by the event.  *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983).  As is typical of evidentiary matters, "the burden of proving that the statement fits squarely within a hearsay exception" rests with the proponent of the hearsay exception, here, the government.  *United States v. Kendrick*, 853 F.2d 492, 496 n.3 (6th Cir. 1988) (citing *United States v. Day,* 789 F.2d 1217, 1221 (6th Cir.1986)).  The district court failed to place the burden of proof on the government, and the majority repeats this error, notwithstanding its assertion to the contrary.

### A.  Gordon's 911 Call

We must decide whether the trial court abused its discretion when it admitted the relevant out-of-court statements (Gordon's 911 call and her statements to police officers at the scene) as excited utterances.  With regard to the 911 call, the district court concluded that each statement contained in the tape recording of the call (save Gordon's claim that Arnold was convicted murderer, a statement the government did not seek to admit) was admissible under the excited-utterance exception to the hearsay rule.  To evaluate this decision, I consider the record evidence regarding the first two prongs of the *Haggins* test.

---

[2] The *Hishaw* court noted that "in certain circumstances," possession of a similar gun on prior occasions "may support an inference of constructive possession."  235 F.3d at 572.  Gordon's reference to a black handgun is certainly too vague for this case to constitute such an occasion, especially in light of testimony that about half of all handguns are black.  J.A. at 128.

**Startling Event.** The government failed to introduce any evidence of a "startling event" outside of the hearsay statement (the 911 call) itself. The majority glosses over this fact, stating without analysis that "being threatened by a convicted murderer wielding a semi-automatic handgun amounts to a startling event that would prompt at least nervous excitement in the average individual, if not outright trauma." Maj. Op. at 6. This may well be true, but absent some independent evidence of such an event, the district court abused its discretion by admitting the tape.

I begin with first principles. Hearsay evidence is generally inadmissible because it is not sufficiently reliable and cannot be tested through cross-examination. *See* 1-14 WEINSTEIN'S EVIDENCE MANUAL § 14.01[1]. However, particular categories of hearsay statements that "contain inherent guarantees of their truthfulness" constitute exceptions to the general prohibition on hearsay. *Haggins*, 715 F.2d at 1057. Excited utterances are one such exception.

"The basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that *eliminate the possibility of fabrication, coaching, or confabulation*, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy." *Idaho v. Wright*, 497 U.S. 805, 820 (1990) (emphasis added). More specifically, "a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance he makes will be spontaneous and trustworthy." *Haggins*, 715 F.2d at 1057 (quoting 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(2)[01] at 803-79 (1981)). To determine whether a hearsay statement contains such guarantees of reliability, we apply the aforementioned three-step inquiry: "First, there must be an event startling enough to cause nervous excitement. Second, the statement must be made before there is time to contrive or misrepresent. Third, the statement must be made while the person is under the stress of excitement caused by the event." *Schreane*, 331 F.3d at 564 (internal quotation marks omitted). And as previously mentioned, the government bears the burden of establishing each of these elements by a preponderance of the evidence. *See Kendrick*, 853 F.2d at 496 n.3.

These first principles demand that the excited utterance itself cannot constitute the only evidence of a startling event; instead, the proponent of a hearsay statement must offer independent corroborating evidence. This is true for two different, but related, reasons.

First, relying on the putative excited utterance itself to show that a startling event occurred is endlessly circular. In such a scenario, the district court would rely on the statement itself to establish an element of the test for whether the statement is sufficiently reliable to be admitted into evidence. Such circularity is problematic in and of itself, although the problem can potentially be explained away by reference to Federal Rule of Evidence 104(a), which permits district courts to resolve preliminary questions regarding admissibility by preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (holding that district courts may resolve preliminary questions under Federal Rule of Evidence 801(d)(2)(E) by preponderance of the evidence).[3] Notably, the record in this case reflects no such determination under Rule 104(a).

---

[3] In *Bourjaily*, the Supreme Court concluded that a district court may consider an alleged co-conspirator's statements regarding the existence of a conspiracy as an aid to establishing Rule 801(d)(2)(E)'s co-conspirator exception to the hearsay rule. 483 U.S. at 180-81. However, the Court explicitly refused to decide whether an alleged co-conspirator's statements could, in and of themselves, satisfy the proponent's burden. *Id.* at 181. Thus, the Supreme Court left open the issue of whether some independent proof of the relevant preliminary fact was required.

In response to *Bourjaily*, Rule 801(d)(2) was amended to reflect that the contents of the statement at issue "are not alone sufficient to establish" the existence of a conspiracy. FED. R. EVID. 801 advisory committee's note, 1997 amendment. This amendment reflects a policy against the type of bootstrapping that the majority here condones.

Second, and significantly, this circularity contradicts the purpose of the excited-utterance exception to the hearsay rule. As noted above, excited utterances are admissible because the startling event and corresponding state of alarm renders it "unlikely that the statement is contrived or the product of reflection." *Haggins*, 715 F.2d 1057. And, as we have previously noted, when determining whether a statement qualifies as an excited utterance, "the ultimate question is whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *Id.* at 1058 (quoting MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 297 at 705-06 (2d ed. 1972)). Without some corroborating evidence of such an exciting event, the district court lacks the capacity to make such a determination, or to determine even that there *was* such an event. Put differently, when the only evidence of the startling event is the proffered statement, the proponent cannot carry its burden of establishing that the relevant circumstances "eliminate the possibility of fabrication," *Wright*, 497 U.S. at 820, or that the statement "contain[s] inherent guarantees of truthfulness," *Haggins*, 715 F.2d at 1057. To the contrary, anyone could contrive a fact that—if real—would cause excitement, and state it in an exclamatory manner. To hold that such a statement, standing alone, is admissible for the truth of the matter asserted stands the hearsay rule on its head.

In this case, the possibility of fabrication was alive and well. Without any independent corroborating evidence of Arnold's alleged gun-brandishing, the following series of events was certainly possible:

> Gordon and Arnold got into an argument and Gordon stormed away angry. Although Arnold never brandished or mentioned a gun during the argument, Gordon knew that her mother kept handguns in the house and in her car. Gordon wanted Arnold to return to jail so that her mother's relationship with him would end, so she contrived a story while fleeing the house: Arnold threatened her with a gun in the course of their argument. She then relayed this story to the 911 operator while still emotionally upset from the altercation.

The point here is not that this turn of events is more likely true than not, but rather that without *any* corroborating evidence of the putative exciting event, the government provided *no indication* that Gordon's statement is any more reliable than any run-of-the-mill inadmissible hearsay statement.[4] The lack of such reliability undermines the rationale for admitting excited utterances, and accordingly, I would hold that the district court abused its discretion by admitting Gordon's statement to the 911 operator without independent corroborating evidence of the alleged startling event.

Reaching the same conclusion that I have, various courts have held that a hearsay statement itself cannot serve as the sole evidence of the alleged startling event that spurred the statement. *See, e.g.*, *State v. Post*, 901 S.W.2d 231, 234-35 (Mo. Ct. App. 1995); *People v. Burton*, 445 N.W.2d 133, 144 (Mich. 1989); *Commonwealth v. Barnes*, 456 A.2d 1037, 1040 (Pa. Super. Ct. 1983); *State v. Terry*, 520 P.2d 1397, 1401 (Wash. Ct. App. 1974); *Truck Ins. Exch. v. Michling*, 364 S.W.2d 172, 174-77 (Tex. 1963); *Beck v. Nat'l Sur. Corp.*, 171 F.2d 862, 863-64 (5th Cir. 1949); *see also People v. Leonard*, 415 N.E.2d 358, 362 (Ill. 1981) (upholding admissibility of statement because independent evidence corroborated occurrence of startling event, but noting that without such

---

[4]Brushing this concern aside, the majority offers five items of "corroborating" evidence. Maj. Op. at 7. As an initial matter, it is far-fetched to count each of these items as an independent piece of evidence. For example, the majority attempts to parse surgically Gordon's "act of calling 911" from the "fear and excitement" in her voice, and to distinguish both of these from the statements made during the call, counting each as a separate factor indicating that the alleged startling event actually occurred. But the point remains that each item is part of the same whole, a whole that is perfectly consistent with the hypothetical contrivance recounted above. The majority's rationale thus fails to illustrate how Gordon's statements in the 911 call are more reliable than any made-up out-of-court allegation.

evidence, statement would be excluded).[5] Even a panel of this court has noted in an unpublished opinion that "an excited utterance can not establish its own underlying event." *United States v. McCullough*, 150 F. App'x 507, 509-10 (6th Cir. 2005) (unpublished opinion). In its supplemental brief, the government notes that some other authorities have reached the opposite conclusion. Appellee's Supp. Br. at 27-28. Although some of these authorities claim that admitting such statements is the "generally prevailing rule," *see United States v. Brown*, 254 F.3d 454, 459 (3d Cir. 2001), they neither cite recent authority nor provide explanations of *why* such circular reasoning is permissible. More troubling, not one of these cases addresses the incompatibility of such bootstrapping with the foundations of the excited-utterance exception to the hearsay rule.[6] The better rule, and the one I would adopt, requires at least some corroborating evidence of the alleged startling event.

**Lack of Time to Contrive or Misrepresent.** The district court concluded, and the majority now concludes, that Gordon lacked the time, between Arnold's allegedly threatening her with a gun and her 911 call, to contrive or misrepresent. Neither, however, provides a clear reason for this conclusion.

In *Haggins*, we noted that "the lapse of time between the startling event and the out-of-court statement," while "not dispositive," was still "[o]ne of the most relevant factors in determining spontaneity" and therefore admissibility. *Haggins*, 715 F.2d at 1057-58.[7] Here, the majority maintains that the government need not establish with precision how much time passed between the two events. Even if this assumption were correct, the government (as the proponent and therefore the party bearing the burden of proof on evidentiary questions) must provide *some* indication of how closely tethered the two events were. But here, the district court placed no such requirement on the government. Instead, the district court admitted, "I don't know the time frame." J.A. at 56. Notwithstanding this uncertainty, the district court concluded *without explanation* that Gordon's phone call "appears to have been made before there was time to contrive or misrepresent." J.A. at 64. Without any explanation or any basis in the record for this conclusion, the district court's decision cannot stand.

Next, the majority places undue emphasis on its interpretation of the tape. Although I question the utility of semantically dissecting Gordon's statements, even if I take the majority's approach, the tape does not indicate that Gordon spoke to the 911 operator before sufficient time to contrive or misrepresent had passed. According to the majority, Gordon said, "he's fixing to shoot me," as opposed to "he was fixing to shoot me." Maj. Op. at 6, 7. After listening to the tape multiple times, I hear the words: "I guess he finna shoot me." I find this significant for two reasons. First, Gordon's inclusion of the words "I guess" (which the majority cleverly excises) renders her statement far less definitive than the majority chooses to present it. More importantly, the statement

---

[5]The excited-utterance rule applicable in each of these cases is substantively indistinguishable from Rule 803(2).

[6]Further, as the Michigan Supreme Court illustrated in *Burton*, the authorities generally cited in support of the government's position are of dubious value. For instance, the vast majority of such authorities predate 1943. *Burton*, 445 N.W.2d at 142. In many of the cases cited in the *McCormick* treatise, independent corroborating evidence of the startling event existed. *Id.* at 142-43. These cases are therefore distinguishable from the case at bar.

Perhaps in recognition of these distinctions, the latest version of the *McCormick* treatise now notes that "[t]he issue [of whether an exciting event may be proved simply by relying on the statement itself] has not yet been resolved under the Federal Rules." 2 McCormick on Evid. § 272 (6th ed. 2006).

[7]In *Haggins* we noted several factors that often will extend the window of time in which a statement may still be considered spontaneous. These factors include the declarant's age, the declarant's physical and mental condition (including shock, intervening unconsciousness, and pain), "the characteristics of the event, and the subject matter of the statements." *Haggins*, 715 F.2d at 1058.

contains no auxiliary verb (e.g., "is" or "was") connected to "finna," which I understand to be a slang contraction for "fixing to," much as "gonna" serves as a contraction for "going to." *See, e.g.*, http://www.urbandictionary.com/define.php?term=finna (last visited Apr. 19, 2007) (defining "finna" as, "Abbreviation of 'fixing to.' Normally means 'going to.'").[8] The lack of an auxiliary verb renders determination of whether Gordon intended to imply the past or present tense an exercise in sheer guesswork. Accordingly, the words spoken on the tape do not establish that Gordon offered these statements before there was time to contrive or misrepresent.

The majority next attempts to satisfy the temporal element by noting that the district court concluded that Gordon sounded nervous and distraught. But this addresses the third element of the *Haggins* test (whether the statement was made while the declarant was under the stress of the event), not the second (whether the statement was made before there was time to contrive or misrepresent), and thus impermissibly collapses the second and third prongs such that a nervous tone, without more, is sufficient to establish both. The speaker's tone, however, is plainly insufficient to satisfy the second element, for whether one sounds nervous or distraught is irrelevant to determining whether sufficient *time* has passed for the speaker to contrive or misrepresent.

Finally, the cases the majority relies upon are readily distinguishable. In *Haggins*, the court found the declarant's statements admissible because of her young "age and physical condition," emphasizing that "[s]he was bleeding and in critical condition." *Haggins*, 715 F.2d at 1058. Gordon, by contrast, is an adult who suffered no physical harm. Similarly, the declarant in *United States v. Baggett*, 251 F.3d 1087, 1090 (6th Cir. 2001), had suffered severe physical abuse that resulted in an undefined period of unconsciousness between the startling event (a prolonged beating) and the statement, which was made in the hospital after she regained consciousness. Likewise, the declarant in *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998), also suffered an intense and prolonged beating, and the declarant in *United States v. Green*, 125 F. App'x 659, 662 (6th Cir. 2005) (unpublished opinion), had been the victim of a physical assault. Again, and unlike each of these declarants, Gordon suffered no physical harm.

For all of these reasons, I would hold that the district court abused its discretion in admitting the 911 call, as the record presently before us cannot permit the government to satisfy either its burden of establishing that an exciting event occurred or its burden of proving that Gordon's statements were made before she had the time to contrive or misrepresent.

## B. Gordon's Statements When the Officers First Arrived

Gordon's statements to the police officers when they first arrived on the scene suffer from the same fatal defects as her statements to the 911 operator: the government failed to present any independent evidence that Arnold pulled a gun on Gordon and similarly failed to show that she lacked the time to contrive or misrepresent. Here, however, the district court and the majority's conclusion regarding the second factor is even more specious, as the relevant evidence before the district court demonstrated a notable temporal disconnect.

Although the district court lacked any evidence regarding whether Gordon had time to contrive or misrepresent before making her 911 call, the evidence before the district court

---

[8]Understanding Gordon's statements in the 911 tape requires an understanding of slang, which is constantly evolving. Turning to a source that operates by consensus, and thus develops along with slang usage, therefore seems unusually appropriate in this instance. UrbanDictionary.com is such a source, as it permits users to propose definitions for slang terms, and other users to vote on whether they agree with the particular definitions posited. At the time of the last visit, the definition cited above (which was posted in June 2003) had received 272 positive votes, and only 45 negative votes, making it the most popular of the twenty proposed definitions of "finna," all but one of which connote future action.

demonstrated that Gordon had sufficient time to contrive or misrepresent before talking to the officers when they arrived on the scene. Gordon made her 911 call at 7:43 a.m., and the call lasted approximately two minutes. Officer Brandon's testimony established that the officers were dispatched sometime between 7:54 and 8:00 and arrived on the scene five to six minutes later. J.A. at 71-72. Thus, in addition to the unknown period of time between Gordon's altercation with Arnold and her 911 call (during the course of which she had begun to calm down), between fourteen and twenty-one minutes elapsed until the officers arrived on the scene. This clearly represents sufficient time for someone in Gordon's position to contrive a story or misrepresent the details of her account.

The majority opinion obscures the time line of these events by assuming that only five minutes passed between the end of Gordon's 911 call and the officers' arrival on the scene. Even if this were true, it does not follow that five minutes is not sufficient time for Gordon to have misrepresented what happened. I know of no binding case holding that an adult declarant who suffered no physical harm is incapable of conscious reflection sufficient to fabricate or misrepresent a story in even this short period of time, let alone the fourteen to twenty-one minutes that actually passed.[9] For these reasons, I would hold that the district court abused its discretion in admitting Gordon's initial statements to the officers as excited utterances.

## C. Gordon's Statements to Officers After Arnold's Arrival

When Arnold returned to the scene in a car driven by Gordon's mother, Gordon repeated to the officers her allegation that Arnold had pulled a gun on her. I would hold that, for reasons similar to those expressed above, the district court abused its discretion by admitting this statement under the excited-utterance exception.

As previously shown, the record contains no independent evidence of Arnold's alleged gun-brandishing, or *any* evidence of the amount of time that elapsed between Gordon's altercation with Arnold and her 911 call. Because of these defects, the government cannot carry its burden of establishing that Gordon's claim that Arnold pulled a gun on her "contain[s] inherent guarantees of truthfulness," *Haggins*, 715 F.2d at 1057, or that there was no "possibility of fabrication," *Wright*, 497 U.S. at 820. Merely repeating an unreliable statement does not miraculously imbue it with reliability. The doubts expressed regarding Gordon's previous statements lead me to conclude that this statement, too, was plainly inadmissible on the record before the district court.

In conclusion, the majority opinion eviscerates the three-part test that has long governed the admissibility of hearsay statements under the excited-utterance exception. The effect of the majority's reasoning is that a statement uttered in an exciting manner, alleging that a startling event occurred, is automatically admissible for the truth of the matter asserted. After today, no independent evidence is required of either the event's occurrence (the first prong) or the amount of time that passed between the alleged event and the statement (the second prong); instead, the declarant's excited tone permits the court to infer both. And after making these inferences, the court may then satisfy the third prong by inferring that the alleged event (the occurrence of which was inferred from the speaker's tone) caused the speaker's tone. Thus, a convincing liar need not fear the pains of perjury, for a court may admit his out-of-court statement for the truth of the matter asserted on the basis of the statement and tone alone, insulating the liar from both oath and cross-examination. This approach is flatly inconsistent with our existing excited-utterance jurisprudence.

---

[9]Even this calculation is extremely charitable to the government, as it assumes that Gordon made the 911 call immediately after the altercation with Arnold. As noted previously, there is *no* support for this assumption in the record.

### III. CONFRONTATION CLAUSE

Even if each of the statements discussed above were admissible under the Federal Rules of Evidence, we must undertake an analysis under the Sixth Amendment's Confrontation Clause. As the majority notes, the crux of the constitutional inquiry for Confrontation Clause challenges has changed since Arnold stood trial. Previously, the government needed to establish only (1) the witness's constitutional unavailability and (2) the statement's indicia of reliability (e.g., admissibility under a hearsay exception). *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). But now, the government must establish that the proffered statements were not "testimonial." *Davis v. Washington*, 126 S. Ct. 2266, 2273 (2006); *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). In this case, the government developed the record to fit the first inquiry; quite understandably, neither the government nor the district court considered the second. But that does not give this court a license to contort the record to fit the *Davis* test, which is exactly what the majority opinion does. In so doing, the majority's revisionist approach effectively turns the applicable burden of proof on its head.

### A. Burden of Proof

The proper starting point of the Confrontation Clause analysis is the allocation of the burden of proof, an issue the majority does not address. When a criminal defendant raises a constitutional challenge to the government's proffered evidence, the government must show by a preponderance of evidence that the evidence is constitutionally admissible. This principle rings true in a variety of circumstances implicating the Fourth and Fifth Amendments. For instance, we have noted that "[t]he government bears the burden of proving that exigent circumstances such as a medical emergency existed to justify a warrantless search." *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 655 (6th Cir. 2006); *see also United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) ("The government, in order to satisfy the exigent-circumstances exception in the present case, must show that there was a risk of serious injury posed to the officers or others that required swift action."). Similarly, in cases involving consent to a search, the government has the burden of demonstrating that the defendant consented to the search, *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000), "that the consent was freely and voluntarily given and was not the result of coercion, duress, or submission to a claim of authority," *United States v. Wellman*, 185 F.3d 651, 657 (6th Cir. 1999), and, in cases involving third-party consent, that the third party had common authority sufficient to consent to a search, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). In the context of the Fifth Amendment, the government must establish by preponderance of the evidence that the defendant knowingly waived his *Miranda* rights, *Colorado v. Connelly*, 479 U.S. 157, 169 (1986), and that any confession was voluntary, *Lego v. Twomey*, 404 U.S. 477, 489 (1972), if the jury is to receive such statements.

The same principle applies in determining admissibility in light of a Confrontation Clause challenge. It is clear that before *Crawford* the government bore the burden of proving the admissibility of statements under the Confrontation Clause. *Roberts*, 448 U.S. at 74-75 ("As with other evidentiary proponents, the prosecution bears the burden of establishing" that a witness is constitutionally unavailable); *Wright*, 497 U.S. at 816 (recognizing that government has the burden of establishing sufficient indicia of reliability). Nothing in either *Crawford* or *Davis* states, or even hints, that the Supreme Court intended to alter this allocation of burdens. The inescapable conclusion, then, is that post-*Davis*, the government retains the burden of defeating, by preponderance of the evidence, a defendant's Confrontation Clause challenge. This means that the government must establish facts showing that the proffered statements are nontestimonial, i.e., that they were "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 126 S. Ct. at 2273. On the record presently before the court, the government cannot meet this burden.

**B. Gordon's 911 Call**

As noted above, the core inquiry under *Davis* is whether the statements were offered to enable police to address an ongoing emergency. *Id.* at 2273. To determine the purpose of the statements, courts must consider the circumstances under which they were made, emphasizing both temporal factors (e.g., whether the statement described present or past events and whether the emergency was ongoing) and environmental factors (e.g., whether the statements were made in a formal, or a safe, setting). *Id.* at 2276-77. Considering these categories of factors as they apply to Gordon's statements to the 911 operator, the record does not contain sufficient information for the government to establish that her statements were nontestimonial. For this reason, the statements are not admissible on the record presently before the court.

First, I consider temporal factors. Notwithstanding the majority opinion's insertion of an auxiliary verb into Gordon's speculative statement regarding Arnold's intent to shoot her, Arnold was clearly reporting *past events* when she spoke to the 911 operator. While she claimed to "need police" at the time of the call, her reasons for this need were all stated in the past tense: "Me and my momma's boyfriend *got* in a throw-up, and he *went* in the house and got a pistol, *pulled* it out on me. I guess he finna shoot me. So I *got* in my car and [inaudible] and *went* around the corner from the house." Audio tape: 911 call dated Sept. 19, 2002. Notably, Gordon spoke in the past tense, as each of the italicized verbs in Gordon's statement illustrates. This is notably different from the statements at issue in *Davis*, where the 911 caller spoke in the present tense, saying "He's here jumpin' on me again," "He's usin' his fists," and "He's runnin' now." *Davis*, 126 S. Ct. at 2271. While McCottry, the victim in the *Davis* case, "was speaking about events *as they were actually happening*," *id.* at 2276, that was not true of Gordon. To the contrary, Gordon was "describ[ing] past events." *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality opinion)) (alteration in original).

Similarly, it is not clear that the environment in which Gordon spoke to the 911 operator was sufficiently chaotic to render her statements nontestimonial. It is true that Gordon sounded upset, and that her voice was raised throughout the 911 call. Nonetheless, we know that Gordon had extricated herself from the scene of the alleged assault, as evidenced by her indication that she had left the house and gone around the corner (either to, or in, her car). The 911 operator knew this fact as well; she reminded Gordon, "Ma'am, listen to me. You're not there now." Audio tape: 911 call dated Sept. 19, 2002. *Davis* strongly suggests that this fact itself may well be sufficient to end the inquiry, as the Court stated that physical separation between the assailant and the alleged victim is often sufficient to terminate the emergency. *Davis*, 126 S. Ct. at 2277 ("after the operator gained the information needed to address the exigency of the moment, *the emergency appears to have ended* (*when Davis drove away from the premises*)." (emphasis added)).

While the majority insists that the emergency continued, insinuating that Gordon feared that Arnold might pursue her, Maj. Op. at 10, the circumstances do not objectively reveal that Gordon considered herself to be in such danger. Short of Gordon's yelling (which reflects her *subjective* emotional state), the 911 call reveals none of the *objective* indicia of her being hunted that one would expect to hear from someone facing such an "ongoing emergency." *Davis*, 126 S. Ct. at 2276. The 911 tape does not contain the sound of footsteps pounding the pavement or heavy breathing, which indicates that Gordon did not run quickly from the house to her car. Nor does it contain any indication that Gordon was operating the car, let alone the sounds of hurriedly driving away from a dangerous situation (ignition starting, engine revving, tires screeching). Remaining stationary in or outside of (the record is unclear) a car sitting "around the corner" from the location of a recent assault with a firearm is hardly the type of behavior exhibited by someone in the throes of an "ongoing emergency."

For these reasons, I would conclude that the statements in Gordon's 911 call are testimonial, and therefore not admissible. At minimum, it is clear to me that on the record presently before the court, the government cannot establish "circumstances *objectively indicating* that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," *id.* at 2273, based on the factors emphasized in *Davis*.

## C. Gordon's Statements When the Officers First Arrived

Because the emergency was no longer "ongoing" when Gordon made her 911 call, Gordon's statements to the officers were also testimonial and thus inadmissible. But one need not accept my conclusion regarding the 911 call to agree with me here. As noted *supra* in Part II, the relevant testimony establishes that fourteen to twenty-one minutes separated the phone call and the officers' arrival. This additional time was certainly sufficient to quell any "emergency" that may have been "ongoing" at the time of the 911 call, especially because the record contains no evidence of any aggravating factors in the interim sufficient to rekindle the emergency.

Further, the record contains no evidence that Gordon fled from her position "around the corner" from 1012 Oak View during this intervening period, which renders it doubtful that any real emergency continued. We know that Joseph Arnold had, at some point, left 1012 Oak View in a car driven by Gordon's mother, but we do not know whether Gordon knew that Arnold left. Either way, the record does not reflect any actions on her part consistent with an ongoing emergency. Assume first that Gordon did not know that Arnold had left the house, but instead was under the impression that he remained in the house. The record's lack of any indication that she left her spot around the corner implies that she felt safe enough to remain within walking (and shooting) distance of the house where her alleged assailant remained. Alternatively, assume that Gordon knew that Arnold had left the house. In this instance, the lack of any evidence that she moved from the corner indicates that she did not think Arnold was pursuing her to shoot or assault her.[10] While the majority may be correct that remaining in the same place "offered the quickest route to making contact with the officers," Maj. Op. at 12, remaining there also offered the quickest route to make contact with a bullet, assuming that an ongoing emergency existed. Simply put, no matter which inference one draws regarding Gordon's knowledge of Arnold's whereabouts, the circumstances do not objectively indicate that the emergency was ongoing.

Similarly, Gordon's statements themselves reveal that they were testimonial. According to Officer Brandon, Gordon said "that her mother's boyfriend had pulled a gun on her," J.A. at 72; and this thus recounted "what had happened in the past," *Davis*, 126 S. Ct. at 2276, as opposed to present events. Like Amy Hammon, the declarant in the other case the Supreme Court decided under the caption of *Davis v. Washington*, Gordon delivered to officers, who had arrived at the scene of an earlier disturbance, a "narrative of past events . . . at some remove in time from the danger she described." *Id.* at 2279. And unlike McCottry, Gordon was not discussing "events *as they were actually happening*," *id.* at 2276 (emphasis in original), as Arnold was not even present when her statements were made. Even if one rejects the previous analyses of which inferences one can reasonably draw based upon Gordon's behavior, that Gordon spoke in the past tense, relaying past events, is sufficient to establish that her statements were testimonial and inadmissible.

## D. Gordon's Statements to Officers After Arnold's Arrival

---

[10] Further, it is overwhelmingly unlikely that Arnold left the house to hunt Gordon, as Arnold returned to the scene in a car driven by Gordon's mother. To conclude otherwise requires one to accept the counterintuitive proposition that Gordon's mother decided to aid Arnold's pursuit of her own daughter, notwithstanding any evidence of hostilities between Gordon and her mother.

Gordon's statements to the officers once Arnold arrived are not admissible under the Confrontation Clause. The relevant testimony indicates that once the car pulled up, Gordon pointed to it and said, "that's him, that's the one that pulled the gun on me." J.A. at 74. This statement, like Gordon's statements to the officers when they first arrived on the scene, clearly references *past* events. As noted previously, Gordon was not recounting "events *as they were actually happening.*" *Davis*, 126 S. Ct. at 2276 (emphasis in original). Additionally, similar to declarant Amy Hammon whose statements were held to be testimonial by the Supreme Court in *Davis*, Gordon made this statement while officers were present on the scene to investigate "possibly criminal past conduct." *Id.* at 2278. Further, Gordon, like Hammon, was protected by the officers. *Id.* at 2279. And, unlike the declarant McCottry whose statements were held to be nontestimonial in the *Davis* case, there is no indication that Gordon was "in immediate danger" when the car arrived. *Id*. For each of these reasons, Gordon's statements were testimonial, and thus inadmissible.

## IV.  REFUSAL TO ADMIT PRIVATE INVESTIGATOR'S STATEMENT

My final disagreement with the majority opinion lies in its conclusion that the district court did not commit reversible error by excluding from evidence a private investigator's statement that Gordon told him that she had never seen Joseph Arnold with a gun that day. In reaching its conclusion, the majority opinion applies plain-error analysis. This approach is highly speculative, as the record demonstrates that Arnold's counsel "brought to the court's attention" the error in not admitting the private investigator's statement, which is all that is necessary for the harmless-error standard to apply. *Compare* FED. R. CRIM. P. 52(a) *with* FED. R. CRIM. P. 52(b). It is true that Arnold's counsel did not specifically mention Federal Rule of Evidence 806 as the basis for admitting the testimony. But such a "specific ground" is necessary only when a party objects to the *admission* of evidence. FED. R. EVID. 103(a)(1). When, as here, a party challenges the *exclusion* of evidence, it is sufficient that the basis for admissibility "be apparent from the context." *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006).[11] Because the district court knew that Arnold sought to introduce testimony that Gordon told a private investigator that Arnold never possessed a gun that day and because it was apparent that Arnold intended to attack Gordon's credibility with this evidence, I believe that harmless-error review should apply.

Assuming *arguendo* that we should review only for plain error, I cannot conclude that this error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Gordon's statements that Arnold threatened her with a gun constituted the only evidence tying Arnold to the gun found in the car. Setting aside the constitutional infirmity of convicting a defendant upon such insufficient evidence, *see supra* Part I, I cannot see how denying the defendant the right to introduce evidence that Gordon later recanted these statements could do anything but affect the fairness and integrity of Arnold's trial. For this reason, I would hold that Arnold has demonstrated that the district court's decision to exclude the investigator's statement was plain error, and remand for a new trial.

## V.  CONCLUSION

For each of the reasons described above, I believe that the district court erred, and the majority today utilizes incorrect analyses and reaches the wrong result.

---

[11]Even this requirement stretches beyond the bounds of the relevant rule's text, as Federal Rule of Evidence 103(a)(2) explicitly requires only that the proponent apprise the district court of "the substance of the evidence" he or she seeks to admit. And that requirement attaches only if the substance of the evidence was not "apparent from the context within which questions were asked." FED. R. EVID. 103(a)(2).